## PRUDENTIAL INSURANCE CO. *v.* BENJAMIN, INSURANCE COMMISSIONER.

No. 707.   Argued March 8, 11, 1946.—Decided June 3, 1946.

*Joseph W. Henderson* argued the cause for appellant. With him on the brief was *Douglas McKay.*

*T. C. Callison,* Assistant Attorney General of South Carolina, and *David W. Robinson* argued the cause for respondent. With them on the brief was *John M. Daniel,* Attorney General.

By special leave of Court, *C. H. Foust* argued the cause for the State of Indiana and other States, in support of appellee. The Attorneys General of Alabama, Indiana, Kansas, Massachusetts, Michigan, Nebraska, New York, Ohio, Oklahoma and Texas filed a brief on behalf of those States, as *amici curiae,* in support of appellee.

Mr. Justice Rutledge delivered the opinion of the Court.

This case and *Robertson v. California, post,* p. 440, bring not unexpected sequels to *United States v. South-Eastern Underwriters Assn.,* 322 U. S. 533. In cycle reminiscent conversely of views advanced there and in *Paul v. Virginia,* 8 Wall. 168, claims are put forward on the basis of the *South-Eastern* decision to sustain immunity from state taxation and, in the *Robertson* case, from state regulation of the business of insurance.

The specific effect asserted in this case is that South Carolina no longer can collect taxes from Prudential, a New Jersey corporation, which for years prior to 1945 the state had levied and the company had paid. The tax is laid on foreign insurance companies and must be paid annually as a condition of receiving a certificate of authority to carry on the business of insurance within the state. The exaction amounts to three per cent of the aggregate of premiums received from business done in South Carolina, without reference to its interstate or local char-

acter.[1]  No similar tax is required of South Carolina corporations.[2]

Prudential insists that the tax discriminates against interstate commerce and in favor of local business, since it is laid only on foreign corporations and is measured by their gross receipts from premiums derived from business done in the state, regardless of its interstate or local character.  Accordingly it says the tax cannot stand consistently with many decisions of this Court outlawing state taxes which discriminate against interstate commerce.[3] South Carolina denies that the tax is discriminatory[4] or

---

[1] The statutes imposing the tax are §§ 7948 and 7949, South Carolina Code of 1942.  Each section in fact imposes a separate tax, the former of two per cent, the latter of one per cent, on gross premium returns "from the State," with provisions under § 7948 for reduction in the amount of the tax scaled to specified investments in South Carolina securities or property.  Both taxes are laid "in addition to the annual license fees now provided by law," and are stated in terms to be required "as an additional and graded license fee" (§ 7948) or as "a graduated license fee."  § 7949.  The two taxes have been treated in combination, for purposes of this litigation, as being in effect a single tax of three per cent.

[2] Sections 7948 and 7949 expressly exempt South Carolina corporations from payment of the tax.  They however are subject to other taxes, which Prudential maintains have no bearing upon the issues, other than possibly to demonstrate the discriminatory character and effects of the exaction in issue.  See note 36.  These are chiefly taxes on real and personal property, incidence of which Prudential largely escapes by the location of its property in other states.

[3] Extending from *Welton* v. *Missouri*, 91 U. S. 275, to *Nippert* v. *Richmond*, 327 U. S. 416.  See the collection of authorities in *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33, 56, n. 11.

[4] In apparent reliance not only upon decisions rendered prior to the *South-Eastern* decision or made without reference to its ruling, e. g., *Lincoln National Ins. Co.* v. *Read*, 325 U. S. 673; *Bethlehem*

has been affected by the *South-Eastern* decision. But in any event it maintains that the tax is valid, more particularly in view of the McCarran Act,[5] by which it is claimed Congress has consented to continuance of this form of taxation and thus has removed any possible constitutional objection which otherwise might exist. This Prudential asserts Congress has not done and could not do.

The State Supreme Court has held the continued exaction of the tax not to be in violation of the commerce clause or affected by the ruling made in the *South-Eastern* case. 207 S. C. 324, 35 S. E. 2d 586. That holding presents the principal basis for this appeal.

## I.

The versatility with which argument inverts state and national power, each in alternation to ward off the other's incidence,[6] is not simply a product of protective self-interest. It is a recurring manifestation of the continuing necessity in our federal system for accommodating the two great basic powers it comprehends. For this Court's

*Motors Corp.* v. *Flynt*, 256 U. S. 421; but indeed also *Paul* v. *Virginia*, 8 Wall. 168; *Hooper* v. *California*, 155 U. S. 648; and like authorities.

The state also maintains that Prudential's South Carolina business is not altogether interstate commerce but consists, in substantial part, of local transactions, the aggregate of which measures the tax, for which view it relies upon such diverse decisions as *McGoldrick* v. *Berwind-White Co.*, 309 U. S. 33; *International Shoe Co.* v. *Shartel*, 279 U. S. 429; *Western Live Stock* v. *Bureau of Revenue*, 303 U. S. 250; and *Polish National Alliance* v. *Labor Board*, 322 U. S. 643. See note 36 and text.

[5] The pertinent portions of the Act are set forth in the text, Part III at note 37.

[6] Cf. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, at notes 9 and 23; but see also note 33 for an early and highly authoritative but less mutually exclusive view of the possible alternatives.

part, from *Gibbons* v. *Ogden,* 9 Wheat. 1, no phase of that process has been more continuous or at times perplexing than reconciling the paramount national authority over commerce, created by Article I, § 8 of the Constitution, with appropriate exercise of the states' reserved powers touching the same or related subject matter.[7]

The continuing adjustment has filled many of the great constitutional gaps of Marshall's time and later.[8]   But not all of the filling has been lasting.   Great emphases of national policy swinging between nation and states in historic conflicts have been reflected, variously and from time to time, in premise and therefore in conclusion of particular dispositions.[9]   In turn, their sum has shifted and reshifted the general balance of authority, inevitably producing some anomaly of logic and of result in the decisions.

No phase has had a more atypical history than regulation of the business of insurance.   This fact is important for the problems now presented.   They have origin in that history.   Their solution cannot escape its influence. Moreover, in law as in other phases of living, reconcilia-

---

[7] Among the volumes which have been written, special reference may be made to Frankfurter, The Commerce Clause (1937); Ribble, State and National Power over Commerce (1937); Gavit, The Commerce Clause (1932); and see Dowling, Interstate Commerce and State Power (1940) 27 Va. L. Rev. 1.   For thoughtful comment since the *South-Eastern* decision, see Patterson, The Future of State Supervision of Insurance (1944) 23 Tex. L. Rev. 18; Note, *Congressional Consent to Discriminatory State Legislation* (1945) 45 Col. L. Rev. 927.

[8] "Judges legislate interstitially and the interstices were great in Marshall's time."   Ribble, State and National Power over Commerce (1937) 47.

[9] "Lines of demarcation are drawn largely according to the pull of the Court at one period towards the interests of local self-government, and at another in the direction of a nation-wide rule."   Frankfurter, The Commerce Clause (1937) 97.

tion of anomalous behavior, long continued, with more normal attitudes is not always easy, when the time for that adjustment comes.

Essentially the problems these cases tender are of that character. It is not necessary to renew the controversy presented in *South-Eastern*. Whether or not that decision properly has been characterized as "precedent-smashing," [10] there was a reorientation of attitudes toward federal power in its relation to the business of insurance conducted across state lines. Necessarily this worked in two directions. As the opinion was at pains to note, 322 U. S. 533, 545 ff., no decision previously had held invalid an Act of Congress on the ground that such business was beyond reach of its power, because previously no attempted exercise of that authority had been brought here in litigation. But from *Paul* v. *Virginia* to *New York Life Ins. Co.* v. *Deer Lodge County*, 231 U. S. 495, negative implication from the commerce clause was held not to place any limitation upon state power over the business, however conducted with reference to state lines. And correlatively this was taken widely, although not universally, to nullify federal authority until the question was squarely presented and answered otherwise in the *South-Eastern* case.

Whether *Paul* v. *Virginia* represented in its day an accommodation with or a departure from the preexisting evolution of commerce clause law and whether its ruling, together with later ones adhering to it, remained consonant with the subsequent general development of that law, may still be debated. But all may concede that the *Paul* case created for the business of insurance a special, if not a wholly unique, way of thinking and acting in the regulation of business done across state lines. See Ribble, State and National Power over Commerce (1937) 89, 186–187.

---

[10] S. Rep. No. 1112, 78th Cong., 2d Sess. 2.

The aegis of federal commerce power continued to spread over and enfold other business so conducted, in both general and specific legislative exertions. Usually this was with judicial approval; and, despite notable instances of initial hostility, the history of judicial limitation of congressional power over commerce, when exercised affirmatively, has been more largely one of retreat than of ultimate victory.[11] The plain words of the grant have made courts cautious, except possibly in some of the instances noted, about nullifying positive exertions of Congress' power over this broad and hard to define field. At the same time, physical and economic change in the way commerce is carried on has called forth a constantly increasing volume of legislation exercising that power.[12]

Concurrently with this general expansion, however, from *Paul* to *South-Eastern* the states took over exclusively the function of regulating the insurance business in its specific legislative manifestations. Congress legislated only in terms applicable to commerce generally, without particularized reference to insurance. At the same time, on the rationalization that insurance was not commerce, yet was business affected with a vast public

---

[11] E. g., *Hammer* v. *Dagenhart,* 247 U. S. 251, overruled by *United States* v. *Darby,* 312 U. S. 100; compare *United States* v. *E. C. Knight Co.,* 156 U. S. 1, with *United States* v. *American Tobacco Co.,* 221 U. S. 106; *Schechter Corp.* v. *United States,* 295 U. S. 495, with *Labor Board* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1. See also discussion in *Wickard* v. *Filburn,* 317 U. S. 111, 118 ff.

See Ribble, State and National Power over Commerce (1937) 63, n. 39, for listing of the decisions invalidating Acts of Congress prior to 1879, noting that Mr. Justice Miller was "but slightly in error" in the statement, in *Trade-Mark Cases,* 100 U. S. 82, 96, that one then might count "on his fingers" those decisions.

[12] Beginning in modern phase with enactment of Interstate Commerce Commission and Anti-Trust legislation near the beginning of the present century. The catalogue is now too long to repeat here.

interest,[13] the states developed comprehensive regulatory and taxing systems. And litigation of their validity came to be freed of commerce clause objections, at any rate from *Deer Lodge* on to *South-Eastern*. Due process in its jurisdictional aspects remained to confine the reach of state power in relation to business affecting other states.[14] But the negative implications of the commerce clause became irrelevant, as such, for the valid exercise of state regulatory and taxing authority.

Meanwhile the business of insurance experienced a nation-wide expansion graphically depicted not only in the facts of the situation presented in the *South-Eastern* case but also in the operations of Prudential as described by its advocates in this cause.[15] These divergent facts,

---

[13] See *German Alliance Ins. Co.* v. *Kansas*, 233 U. S. 389, 414, 415; *La Tourette* v. *McMaster*, 248 U. S. 465, 467; *National Union Fire Ins. Co.* v. *Wanberg*, 260 U. S. 71, 74; cf. *Osborn* v. *Ozlin*, 310 U. S. 53, 65: "Government has always had a special relation to insurance." See also *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, dissenting opinion at 585.

[14] See *Allgeyer* v. *Louisiana*, 165 U. S. 578; *New York Life Ins. Co.* v. *Head*, 234 U. S. 149; *Fidelity & Deposit Co.* v. *Tafoya*, 270 U. S. 426; *St. Louis Compress Co.* v. *Arkansas*, 260 U. S. 346; *Hoopeston Co.* v. *Cullen*, 318 U. S. 313; Powell, The Supreme Court and State Police Power, 1922–1930 (1932) 18 Va. L. Rev. 1, 140 *et seq.*; also *St. Louis Southwestern R. Co.* v. *Alexander*, 227 U. S. 218, with which compare Henderson, The Position of Foreign Corporations in American Constitutional Law (1918) c. V. Cf. *Harvester Co.* v. *Dept. of Treasury*, 322 U. S. 340, concurring opinion, 349, at 353 ff.; and see *International Shoe Co.* v. *Washington*, 326 U. S. 310.

[15] According to Prudential's brief, it transacts business in all forty-eight states and on December 31, 1944, "had in force 33,933,077 policies, insuring approximately 22,900,000 persons, for a total amount of $22,741,134,075; and 36,733 annuity contracts operative during the lives of approximately 300,000 persons and providing for an annual income of approximately $63,200,000 on such lives. During the year 1944 the Appellant issued 2,412,150 policies, insuring the lives of approximately 2,170,000 persons, in the total amount of $2,668,714,022; and entered into 451 annuity contracts operative during the lives of

legal and economic, necessarily were reflected in state legislation. States grappling with nation-wide, but nationally unregulated, business inevitably exerted their powers to limits and in ways not sought generally to be applied to other business held to be within the reach of the commerce clause's implied prohibition. Obvious and widespread examples are furnished in broad and detailed licensing provisions, for the doing of business within the states, and in connected or distinct taxing measures drawn in apparent reliance upon freedom from commerce clause limitations.[16]

Now we are told many of these statutes no longer can stand. The process of readjustment began affirmatively with *South-Eastern*. Since the commerce clause is a two-edged instrument, the indicated next step, indeed the constitutionally required one, as the argument runs, is to apply its negatively cutting edge. Conceptions so developed with reference to other commerce must now be extended to the commerce of insurance in completion of the readjustment. This, it is confidently asserted, will require striking down much of the state legislation enacted

approximately 600 persons and providing for an annual income of approximately $150,000 on such lives. During the year 1944 the Appellant collected as premiums on insurance policies $681,052,095.07, and paid out as claims on policies $246,776,197.45; and it paid out $13,690,781.93 on annuity contracts."

For South Carolina, the company "had in force 26,373 policies insuring the lives of approximately 20,000 persons resident in said State for a total amount of $30,827,184.00. During the year ending December 31, 1944, 1,439 policies insuring the lives of approximately 1,000 persons resident in said State for a total amount of $1,475,062.00 were issued, and $457,602.28 in claims were paid on policies covering the lives of residents." The South Carolina premium tax for 1943 amounted to $18,496.87; for 1944, $19,676.94. All other state or local taxes paid in 1944 amounted to $3,103.92, making a total for the year for all taxes of $22,780.86.

[16] 322 U. S. 533, dissenting opinion at 590; see note 40, *infra;* cf. *Robertson* v. *California, post,* p. 440.

and effective prior to the *South-Eastern* decision. Particularly will this be true of all discriminatory state taxes, of which it is said South Carolina's is one. Moreover, those results must follow regardless of the McCarran Act's provisions. For by that Act, in Prudential's assessment, Congress neither intended to, nor could, validate such taxes.

It is not surprising that the attack is thus broad. When a decision is conceived as precedent-smashing, rightly or wrongly, the conception's invitation may be to greater backtracking than is justified, in spite of warning to proceed with care. 322 U. S. 533, 547 ff.

Prudential's misconception relates not to the necessity for applying, but to the nature and scope of the negative function of the commerce clause. It is not the simple, clean-cutting tool supposed. Nor is its swath always correlative with that cut by the affirmative edge, as seems to be assumed. For cleanly as the commerce clause has worked affirmatively on the whole, its implied negative operation on state power has been uneven, at times highly variable. More often than not, in matters more governable by logic and less by experience, the business of negative implication is slippery. Into what is thus left open for inference to fill, divergent ideas of meaning may be read much more readily than into what has been made explicit by affirmation. That possibility is broadened immeasurably when not logic alone, but large choices of policy, affected in this instance by evolving experience of federalism, control in giving content to the implied negation. In all our constitutional history this has become no more apparent than in commerce clause dispositions.

That the clause imposes some restraint upon state power has never been doubted. For otherwise the grant of power to Congress would be wholly ineffective. But the limitation not only is implied. It is open to different implications of meaning. And this accounts largely for

variations in this field continuing almost from the begin-
ning until now.[17] They started with Marshall and Taney,

---

[17] That the question was discussed but not settled in the Constitu-
tional Convention itself, appears from debate on September 15, 1787,
two days before submission of the proposed Constitution to Congress,
a portion of which bears quotation:

"Mr. Mc.Henry & Mr. Carrol moved that 'no State shall be re-
strained from laying duties of tonnage for the purpose of clearing
harbours and erecting light-houses.'

"Col. Mason in support of this explained and urged the situation of
the Chesapeak which peculiarly required expences of this sort.

"Mr. Govr. Morris. The States are not restrained from laying ton-
nage as the Constitution now Stands. The exception proposed will
imply the Contrary, and will put the States in a worse condition than
the gentleman (Col Mason) wishes.

"Mr. Madison. Whether the States are now restrained from laying
tonnage duties depends on the extent of the power 'to regulate com-
merce.' These terms are vague but seem to exclude this power of the
States— They may certainly be restrained by Treaty. He observed
that there were other objects for tonnage Duties as the support of
Seamen &c. He was more & more convinced that the regulation of
Commerce was in its nature indivisible and ought to be wholly under
one authority.

"Mr. Sherman. The power of the U. States to regulate trade being
supreme can controul interferences of the State regulations [when]
such interferences happen; so that there is no danger to be appre-
hended from a concurrent jurisdiction.

"Mr. Langdon insisted that the regulation of tonnage was an essen-
tial part of the regulation of trade, and that the States ought to have
nothing to do with it. On motion 'that no State shall lay any duty
on tonnage without the Consent of Congress'

"N. H— ay—Mas. ay. Ct. divd. N. J. ay. Pa. no. Del. ay. Md. ay.
Va. no. N— C. no S— C. ay. Geo. no. [Ayes — 6; noes — 4; di-
vided — 1.]" Farrand, Records of the Federal Constitutional Con-
vention of 1787 (1937), Vol. II, 625–626.

See Note, Congressional Consent to Discriminatory State Legislation
(1945) 45 Col. L. Rev. 927, 946 ff., for a short summary of views
expressed in the debates and later by members of the Convention.
See also Abel, The Commerce Clause in the Constitutional Convention
and in Contemporary Comment (1941) 25 Minn. L. Rev. 432; Hamil-
ton and Adair, The Power to Govern (1937).

went forward from Waite to Fuller, and have been projected in later differences perhaps less broad, but hardly less controversial.[18]   Consequently in its prohibitive, as in its affirmative or enabling, effects the history of the commerce clause has been one of very considerable judicial oscillation.

Moreover, the parallel encompasses the latest turn in the long-run trend.   For, concurrently with the broadening of the scope for permissible application of federal authority,[19] the tendency also has run toward sustaining state regulatory and taxing measures formerly regarded as inconsonant with Congress' unexercised power over commerce,[20] and to doing so by a new, or renewed, emphasis on facts and practical considerations rather than dogmatic logistic.[21]   These facts are of great importance for dispos-

---

[18] "The categories of 'burdens' on interstate commerce, of state laws 'directly affecting' interstate commerce, etc., are natural concomitants of Marshall's doctrine.   The theories as to the silence of Congress are the outgrowth of Taney's.   When diverse theories cohabit, the miscegenation may produce strange progeny."   Ribble, 204.   For tracings of all but the latest of the various trends, see the summaries cited in note 7; see also Biklé, The Silence of Congress (1927) 41 Harv. L. Rev. 200.   More recent diversities are discussed in Dowling, Interstate Commerce and State Power, 27 Va. L. Rev. 1, 8 ff.   See also e. g., the different views expressed in *Nippert* v. *Richmond,* 327 U. S. 416; *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761; *McLeod* v. *Dilworth Co.,* 322 U. S. 327; *Northwest Airlines* v. *Minnesota,* 322 U. S. 292; and the opinions in *Hooven & Allison Co.* v. *Evatt,* 324 U. S. 652.   And compare *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, with *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307.

[19] See note 11 and text.

[20] Cf., e. g., *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177; *Western Live Stock* v. *Bureau of Revenue,* 303 U. S. 250; *McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33; *Nelson* v. *Sears, Roebuck & Co.,* 312 U. S. 359; *California* v. *Thompson,* 313 U. S. 109; *Duckworth* v. *Arkansas,* 314 U. S. 390; *Union Brokerage Co.* v. *Jensen,* 322 U. S. 202, 209 ff.

[21] Cf. *Nippert* v. *Richmond,* 327 U. S. 416, 424, 431, notes 9 and 23, and authorities cited.

ing of such controversies. For in effect they have transferred the general problem of adjustment to a level more tolerant of both state and federal legislative action.

## II.

We are not required however to consider whether, on that level, the authorities on which Prudential chiefly relies would require invalidation of South Carolina's tax. For they are not in point.

As has been stated, they are the cases which from *Welton* v. *Missouri,* 91 U. S. 275, until now have outlawed state taxes found to discriminate against interstate commerce.[22] No one of them involved a situation like that now here. In each the question of validity of the state taxing statute arose when Congress' power lay dormant. In none had Congress acted or purported to act, either by way of consenting to the state's tax or otherwise. Those cases therefore presented no question of the validity of such a tax where Congress had taken affirmative action consenting to it or purporting to give it validity. Nor, consequently, could they stand as controlling precedents for such a case.

This would seem so obvious as hardly to require further comment, except for the fact that Prudential has argued

---

[22] See note 3, and compare: ". . . state laws are not invalid under the Commerce Clause unless they actually discriminate against interstate commerce or conflict with a regulation enacted by Congress." *Gwin, White & Prince* v. *Henneford,* 305 U. S. 434, dissenting opinion at 446.

". . . except for state acts designed to impose discriminatory burdens on interstate commerce because it *is* interstate—Congress alone must 'determine how far [interstate commerce] . . . shall be free and untrammelled, how far it shall be burdened by duties and imposts, and how far it shall be prohibited.' " *Id.* at 455.

See also, for essentially the same position, *Adams Mfg. Co.* v. *Storen,* 304 U. S. 307, dissenting opinion; *Southern Pacific Co.* v. *Arizona,* 325 U. S. 761, dissenting opinion at 795.

so earnestly to the contrary. Its position puts the McCarran Act to one side, either as not intended to have effect toward validating this sort of tax or, if construed otherwise, as constitutionally ineffective to do so. Those questions present the controlling issues in this case. But before we turn to them it will be helpful to note the exact effects of Prudential's argument.

Fundamentally it maintains that the commerce clause "of its own force" and without reference to any action by Congress, whether through its silence [23] or otherwise, forbids discriminatory state taxation of interstate commerce. This is to say, in effect, that neither Congress acting affirmatively nor Congress and the states thus acting coordinately can validly impose any regulation which the Court has found or would find to be forbidden by the commerce clause, if laid only by state action taken while Congress' power lies dormant. In this view the limits of state power to regulate commerce in the absence of affirmative action by Congress are also the limits of Congress' permissible action in this respect, whether taken alone or in coordination with state legislation.

Merely to state the position in this way compels its rejection. So conceived, Congress' power over commerce would be nullified to a very large extent.[24] For in all the variations of commerce clause theory it has never been the law that what the states may do in the regulation of commerce, Congress being silent, is the full measure of its power. Much less has this boundary been thought to

---

[23] See note 18.

[24] Thus, for instance, the limitations upon the length of trains imposed by the Arizona Train Limit Law, and held to be in violation of the commerce clause in *Southern Pacific Co.* v. *Arizona*, 325 U. S. 761, would be beyond the power of Congress, perhaps also of Congress and the states acting together, to impose; and on commerce clause grounds, thus nullifying the very power conferred in order to regulate such matters. The argument is reminiscent of that of Mr. Justice McLean in the second *Wheeling Bridge* case, cf. note 34.

confine what Congress and the states acting together may accomplish. So to regard the matter would invert the constitutional grant into a limitation upon the very power it confers.

The commerce clause is in no sense a limitation upon the power of Congress over interstate and foreign commerce. On the contrary, it is, as Marshall declared in *Gibbons* v. *Ogden,* a grant to Congress of plenary and supreme authority over those subjects. The only limitation it places upon Congress' power is in respect to what constitutes commerce, including whatever rightly may be found to affect it sufficiently to make congressional regulation necessary or appropriate.[25] This limitation, of course, is entirely distinct from the implied prohibition of the commerce clause. The one is concerned with defining commerce, with fixing the outer boundary of the field over which the authority granted shall govern. The other relates only to matters within the field of commerce, once this is defined, including whatever may fall within the "affectation" doctrine. The one limitation bounds the power of Congress. The other confines only the powers of the states. And the two areas are not coextensive. The distinction is not always clearly observed, for both questions may and indeed at times do arise in the same case and in close relationship.[26] But to blur them and thereby equate the implied prohibition with the affirmative endowment is altogether fallacious. There is no such equivalence.

This appears most obviously perhaps in the cases most important for the decision in this cause. They are the ones involving situations where the silence of Congress or the dormancy of its power has been taken judicially,

[25] Cf. note 11 and text.
[26] See the argument for the plaintiff in error in *Paul* v. *Virginia,* 8 Wall. 168, 172, 173, as a classic instance.

on one view or another of its constitutional effects,[27] as forbidding state action, only to have Congress later disclaim the prohibition or undertake to nullify it.[28] Not yet has this Court held such a disclaimer invalid or that state action supported by it could not stand. On the contrary, in each instance it has given effect to the congressional judgment contradicting its own previous one.[29]

It is true that rationalizations have differed concerning those decisions,[30] indeed also that the judges participating in them differed in this respect.[31] But the results have been lasting and are at least as important, for the direction given to the process of accommodating federal and state authority, as the reasons stated for reaching them. None

[27] Cf. note 18. See also the discussions cited in note 7.

[28] Legislation which, typically, has presented the problem is found in a variety of measures, of which the Wilson Act, 26 Stat. 313, is the prototype. Earlier legislation presenting the difficulty was that involved in the second of the *Wheeling Bridge* cases, *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421. See note 43 for further citations.

[29] *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 518, with which compare *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, and *The Clinton Bridge*, 10 Wall. 454; *Leisy* v. *Hardin*, 135 U. S. 100, with which compare *In re Rahrer*, 140 U. S. 545; *Bowman* v. *Chicago & Northwestern R. Co.*, 125 U. S. 465, with which compare *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311.

[30] See, e. g., Ribble, at 62, 106, and other materials cited above in note 7.

[31] For the modern record it is interesting to note that in the first *Bridge* case Justice McLean spoke for the Court, Chief Justice Taney and Justice Daniel dissenting in separate opinions, and the same division prevailed in the further opinions filed upon consideration of the master's report and entry of the decree. In the second *Bridge* case Justice Nelson spoke for the Court, with Justices McLean, Grier, Wayne and Daniel each filing separate opinions dissenting on one or more of the issues presented.

of the decisions conceded, because none involved any question of, the power of Congress to make conclusive its own mandate concerning what is commerce. But apart from that function of defining the outer boundary of its power, whenever Congress' judgment has been uttered affirmatively to contradict the Court's previously expressed view that specific action taken by the states in Congress' silence was forbidden by the commerce clause, this body has accommodated its previous judgment to Congress' expressed approval.

Some part of this readjustment may be explained in ways acceptable on any theory of the commerce clause and the relations of Congress and the courts toward its functioning.[32] Such explanations, however, hardly go to the root of the matter. For the fact remains that, in these instances, the sustaining of Congress' overriding action has involved something beyond correction of erroneous factual judgment in deference to Congress' presumably better-informed view of the facts,[33] and also beyond giving due

---

[32] Thus, in some instances conceivably the reversal might be rationalized as only one of factual judgment, made in deference to the contrary finding of like character made by a body better able to make such a determination. Moreover, Congress' supporting action deprives the Court's adverse view concerning state legislation of any strength which may have been derived from the inference that Congress, by its silence, had impliedly forbidden it. Hence insofar as its judgment may be taken, not as conclusive, but as being entitled to deference here on questions relating to its power (and historically the scope of that deference has been great, cf. note 11), Congress' explicit repudiation of the attitude inferentially attributed to it from its silence, compels reversal of the Court's earlier pronounced view.

[33] In the first *Wheeling Bridge* case the Court itself made the finding, upon evidence taken by a master, that the bridge in fact obstructed navigation, to which it added the legal conclusion that it was a public nuisance, and went on to specify the height to which it must be raised to avoid this effect. Not only this finding of fact, therefore, but also the legal conclusion drawn from it was, in effect, overturned by the Act

deference to its conception of the scope of its powers, when it repudiates, just as when its silence is thought to support, the inference that it has forbidden state action.[34]

Prudential has not squarely met this fact. Fixed with the sense of applicability of the *Welton* or *Shelby County* line of cases, it rather has posed an enigma for the bearing of the bridge and liquor cases upon the decision to be made. It is, if the commerce clause "by its own force" forbids discriminatory state taxation, or other measures, how is it that Congress by expressly consenting can give that action validity?

The answer need not be labored. Prudential in this case makes no contention that commerce is not involved. Its argument is exactly the opposite. Its contention

---

of Congress. See note 34. The finding of obstruction in fact depended in no sense upon previous determination by Congress. But the Court found in Congress' prior legislation a policy of freedom for navigation which it applied to outlaw the bridge.

[34] See note 33. "So far, therefore, as this bridge created an obstruction to the free navigation of the river, in view of the previous acts of congress, they are to be regarded as modified by this subsequent legislation; and, although it still may be an obstruction in fact, is not so in the contemplation of law. . . . The regulation of commerce includes intercourse and navigation, and, of course, the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation . . . ." Mr. Justice Nelson, speaking for the Court, in the second *Wheeling Bridge* case, 18 How. 421, 430, 431.

Compare the dissenting opinion of Mr. Justice McLean, who wrote for the majority in the first *Wheeling Bridge* case, going not only on the ground, among others, that the Act of Congress invaded the judicial function, but also that the Act, apart from this effect, was unconstitutional: "It [Congress] may, under this power, declare that no bridge shall be built which shall be an obstruction to the use of a navigable water. And this, it would seem, is as far as the commercial power by congress can be exercised." 18 How. at 442. Thus was the grant of authority to Congress upon which he relied in the first decision, in part, to outlaw the bridge, converted into a limitation. Cf. text Part II, at note 24 ff.

founded on the commerce clause is one wholly of implied prohibition within the field of commerce.

This it regards as operative not only in Congress' silence, but in the face of its positive expression by the McCarran Act that the continued regulation and taxation by the states of the business of insurance is in accord with Congress' policy. That expression raises questions concerning its own validity and also concerning whether the policy stated extends to the kind of state legislation which is immediately in issue. But those questions are not answered, as Prudential seeks to have them answered, by any conception that Congress' declaration of policy adds nothing to the validity of what the states have done within the area covered by the declaration or, in other words, that it is mere *brutum fulmen*. For to do this not only would produce intolerable consequences for restricting Congress' power. It would ignore the very basis on which the second *Wheeling Bridge* case and indeed the *Clark Distilling* case have set the pattern of the law for governing situations like that now presented.[35] Accordingly we turn to the issues which are more alive and significant for the future.

### III.

In considering the issues raised by the McCarran Act and the question of its applicability, ground may be cleared by putting aside some matters strenuously argued in the State Supreme Court and here. First, it follows from what has been said that we are not required to determine whether South Carolina's tax would be valid in the dormancy of Congress' power. For Congress has expressly stated its intent and policy in the Act. And, for reasons to be stated, we think that the declaration's effect is clearly to sustain the exaction and that this can be done without violating any constitutional provision.

---

[35] Cf. note 29 and text. And see Part IV.

By the same token, we need not consider whether the tax, if operative in Congress' unilluminated silence, would be discriminatory in the sense of an exaction forbidden by the commerce clause, as Prudential categorically asserts, or not so, as South Carolina maintains with equal certitude. Much attention has been given both here and in the state court to these questions. But in the view we take of the case the controlling issues undercut them. Nor do we determine, as Prudential's argument seems to subsume, whether all of its business done in South Carolina and affected by the tax should be regarded as constituting interstate commerce so as to fall within the "in commerce" classification or, on the other hand, some of it may properly be considered as being only local or intrastate business.[36] These questions we put to one side.

---

[36] Whether within or without the "affectation" doctrine. Cf. *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, 548, and authorities cited.

In making these assumptions, however, it is not improper to note that the record, as made in the state court, does not purport to deal factually with the latter question as a matter of proof. It is simply alleged that all of Prudential's South Carolina business is done interstate, an allegation which is denied; and there are supporting allegations concerning the extent of the business and manner of conducting it.

Nor is the case in much better shape factually on the question of discrimination. While the briefs include tables of figures designed to show that Prudential pays more proportionately under the tax than South Carolina corporations pay under other taxes levied against them, cf. note 2, these figures were not made part of the record in the state court until the petition for rehearing was filed, and Prudential has insisted both there and here that they have no proper place in consideration of the questions presented. Its position is that the tax is discriminatory on the face of the statute and without reference to other taxes South Carolina corporations may pay. Cf. note 4.

We express no opinion concerning whether such a showing, in either respect, would be sufficient to require determination of the issues to which it is directed, tendered in the absence of action by Congress.

And for present purposes we assume that the tax would be discriminatory in the sense of Prudential's contention and that all of its business done in South Carolina and affected by the tax is done "in" or as a part of interstate commerce.

It is not necessary to spend much time with interpreting the McCarran Act. Pertinently it is as follows:

> ". . . the Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
>
> "SEC. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> "(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ." 59 Stat. 33, 34; 15 U. S. C. §§ 1011–1015.[37]

Obviously Congress' purpose was broadly to give support to the existing and future state systems for regulating and taxing the business of insurance. This was done in two ways. One was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly pro-

---

[37] The remainder of the statute, including a proviso to § 2 (b), relates to applicability of the Sherman Act and other related federal statutes to the business of insurance before and after January 1, 1948; provides that the McCarran Act shall not affect in any manner the application to that business of the National Labor Relations Act, the Fair Labor Standards Act or the Merchant Marine Act of 1920; extends the term "State" as used in the Act to include specified territories and the District of Columbia; and provides for severability.

vided in the Act itself or in future legislation.[38]   The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it "shall be subject to" the laws of the several states in these respects.

Moreover, in taking this action Congress must have had full knowledge of the nation-wide existence of state systems of regulation and taxation; of the fact that they differ greatly in the scope and character of the regulations imposed and of the taxes exacted; and of the further fact that many, if not all, include features which, to some extent, have not been applied generally to other interstate business.   Congress could not have been unacquainted with these facts and its purpose was evidently to throw the whole weight of its power behind the state systems, notwithstanding these variations.

It would serve no useful purpose now to inquire whether or how far this effort was necessary, in view of the explicit reservations made in the majority opinion in the South-Eastern case.   Nor is it necessary to conclude that Congress, by enacting the McCarran Act, sought to validate every existing state regulation or tax.   For in all that mass of legislation must have lain some provisions which may have been subject to serious question on the score of other constitutional limitations in addition to commerce clause objections arising in the dormancy of Congress' power. And we agree with Prudential that there can be no inference that Congress intended to circumvent constitutional limitations upon its own power.

But, though Congress had no purpose to validate unconstitutional provisions of state laws, except in so far as the Constitution itself gives Congress the power to do this by removing obstacles to state action arising from its own

---

[38] See note 37.

action or by consenting to such laws, H. Rep. No. 143, 79th Cong., 1st Sess., p. 3, it clearly put the full weight of its power behind existing and future state legislation to sustain it from any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for.

Two conclusions, corollary in character and important for this case, must be drawn from Congress' action and the circumstances in which it was taken. One is that Congress intended to declare, and in effect declared, that uniformity of regulation, and of state taxation,[39] are not required in reference to the business of insurance by the national public interest, except in the specific respects otherwise expressly provided for. This necessarily was a determination by Congress that state taxes, which in its silence might be held invalid as discriminatory, do not place on interstate insurance business a burden which it is unable generally to bear or should not bear in the competition with local business. Such taxes were not uncommon among the states,[40] and the statute clearly included South Carolina's tax now in issue.

---

[39] There is, of course, no constitutional requirement that state taxes must be uniform, in the sense of that requirement as laid upon the federal taxing power by the first clause of Article I, § 8. Nor has it ever been held that such a requirement is made by the commerce clause or any other constitutional provision. This is a different thing entirely from the strictures against discrimination within or by a state laid under the equal protection and commerce clauses.

The McCarran Act is, in effect, a determination by Congress that the business of insurance, though done in interstate commerce, is not of such a character as to require uniformity of treatment within the distinction taken in the doctrine of *Cooley* v. *Board of Wardens*, 12 How. 299, except as otherwise expressly declared.

[40] As of the effective date of the McCarran Act, sixteen states had imposed on "foreign" life insurance companies taxes substantially similar to the South Carolina tax in issue. Ala. Code (1940) tit. 51,

That judgment was one of policy and reflected long and clear experience. For, notwithstanding the long incidence of the tax and its payment by Prudential without question prior to the *South-Eastern* decision, the record of Prudential's continuous success in South Carolina over decades [41] refutes any idea that payment of the tax handicapped it in any way tending to exclude it from competition with local business or with domestic insurance companies. Indeed Prudential makes no contrary contention on any factual basis, nor could it well do so. For the *South-Eastern* decision did not, and could not, wipe out all this experience or its weight for bearing, as a matter of the practical consequences resulting from operation of the tax, upon that question. *Robertson* v. *California, post,* p. 440.

Consequently Prudential's case for discrimination must rest upon the idea either that the commerce clause forbids the state to exact more from it in taxes than from purely local business; or that the tax is somehow technically of an inherently discriminatory character or possibly of a type which would exclude or seriously handicap new en-

§§ 816, 819; Fla. Stat. (1941) § 205.43 (1), (6); Ill. Rev. Stat. (1943) c. 73, § 1021; Ind. Stat. Ann. (Burns, 1940) § 39–4802; Kan. Gen. Stat. Ann. (Corrick, 1935) § 40–252; Ky. Rev. Stat. (1944) § 136.330; La. Gen. Stat. (Dart, 1939) § 8369; Mich. Comp. Laws (1929) § 12387; Mo. Rev. Stat. (1939) § 6094; Neb. Rev. Stat. (1943) § 77–902; N. M. Stat. Ann. (1941) § 60–401; N. D. Comp. Laws (1913) § 4924; Ohio Code Ann. (Throckmorton, 1940) § 5433; Pa. Stat. Ann. (Purdon, 1930) tit. 72, § 2261; S. C. Code (1942) §§ 7948, 7949; Tex. Civ. Stat. (Vernon, 1925) Art. 4769.

We express no opinion concerning the validity of any feature of these statutes not substantially identical with those of the South Carolina tax dealt with herein.

[41] Prudential was first authorized to do business in South Carolina in 1897 and since that time it has received annual renewals of its license. As to the present scope of its business in South Carolina and in all the states, see note 15.

trants seeking to establish themselves in South Carolina. As to each of these grounds, moreover, the argument subsumes that Congress' contrary judgment, as a matter of policy relating to the regulation of interstate commerce, cannot be effective, either "of its own force" alone or as operative in conjunction with and to sustain the state's policy.

## IV.

In view of all these considerations, we would be going very far to rule that South Carolina no longer may collect her tax. To do so would flout the expressly declared policies of both Congress and the state. Moreover it would establish a ruling never heretofore made and in doing this would depart from the whole trend of decision in a great variety of situations most analogous to the one now presented. For, as we have already emphasized, the authorities most closely in point upon the problem are not, as appellant insists, those relating to discriminatory state taxes laid in the dormancy of Congress' power. They are rather the decisions which, in every instance thus far not later overturned,[42] have sustained coordinated action taken by Congress and the states in the regulation of commerce.[43]

---

[42] Cf. *Ashton* v. *Cameron County District,* 298 U. S. 513, which may be said in effect to have been overruled by *United States* v. *Bekins,* 304 U. S. 27. See Jackson, The Struggle for Judicial Supremacy (1941) 240–241.

[43] See *Carmichael* v. *Southern Coal Co.,* 301 U. S. 495; *Steward Machine Co.* v. *Davis,* 301 U. S. 548; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.,* 299 U. S. 334; *Clark Distilling Co.* v. *Western Maryland R. Co.,* 242 U. S. 311; *Whitfield* v. *Ohio,* 297 U. S. 431; *In re Rahrer,* 140 U. S. 545; *Perkins* v. *Pennsylvania,* 314 U. S. 586; *Standard Dredging Co.* v. *Murphy,* 319 U. S. 306, 308; *International Shoe Co.* v. *Washington,* 326 U. S. 310, 315; cf. *Parker* v. *Richard,* 250 U. S. 235, 238–239. See generally Koenig, Federal and State Cooperation under the Constitution (1938) 36 Mich. L. Rev. 752.

434

The power of Congress over commerce exercised entirely without reference to coordinated action of the states is not restricted, except as the Constitution expressly provides,[44] by any limitation which forbids it to discriminate against interstate commerce and in favor of local trade. Its plenary scope enables Congress not only to promote but also to prohibit interstate commerce, as it has done frequently and for a great variety of reasons.[45] That power does not run down a one-way street or one of narrowly fixed dimensions. Congress may keep the way open, confine it broadly or closely, or close it entirely, subject only to the restrictions placed upon its authority by other constitutional provisions and the requirement that it shall not invade the domains of action reserved exclusively for the states.

This broad authority Congress may exercise alone, subject to those limitations, or in conjunction with coordinated action by the states,[46] in which case limitations imposed for the preservation of their powers become inoperative and only those designed to forbid action altogether by any power or combination of powers in our govern-

[44] *North American Co.* v. *Securities & Exchange Commission,* 327 U. S. 686, 704–705; *United States* v. *Darby,* 312 U. S. 100, 114–115; *Gibbons* v. *Ogden,* 9 Wheat. 1, 196. For example, the provisions of Article I, § 9, forbidding the giving of preferences "by any Regulation of Commerce or Revenue to the Ports of one State over those of another"; and commanding that "No Tax or Duty shall be laid on Articles exported from any State," held applicable only to foreign commerce in *Dooley* v. *United States,* 183 U. S. 151.

But compare the further provision of Article I, § 10, empowering Congress to consent to laying of duties or imposts on exports by the states. See also note 47.

[45] E. g., *Reid* v. *Colorado,* 187 U. S. 137; *Champion* v. *Ames,* 188 U. S. 321; *Hipolite Egg Co.* v. *United States,* 220 U. S. 45; *Hoke* v. *United States,* 227 U. S. 308; *United States* v. *Darby,* 312 U. S. 100, overruling *Hammer* v. *Dagenhart,* 247 U. S. 251.

[46] See cases cited in notes 29 and 43.

mental system remain effective.[47]   Here both Congress and South Carolina have acted, and in complete coordination, to sustain the tax.   It is therefore reinforced by

[47] It is perhaps impossible to point with certainty to any such explicit limitation among the various commerce clauses of the Constitution, for decision in the application of such provisions to such a combined exercise of powers is sparse.   See, however, the discussion in *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 433 *et seq.*, relating to the clause of Article I, § 9, providing: "No Preference shall be given by any Regulation of Commerce or Revenue to the Ports of one State over those of another: nor shall Vessels bound to, or from, one State, be obliged to enter, clear or pay Duties in another."

There can be no doubt that the combined exercise of state and federal authority is limited, to some but largely undefined extent, by other constitutional prohibitions or the combined effects of more than one.   Cf. text herein at note 49 *et seq.*   But apart from the provision of Article I, § 9, above quoted as a possible exception, the specific limitations placed upon the commerce power or state power in relation to commerce expressly provide for joint action to be effective.   Thus, this is true with reference to laying of duties on exports by the states with the consent of Congress, Art. I, § 10, notwithstanding the prohibition of such action by congressional action alone, Art. I, § 9, and of course by state action alone.   Art. I, § 10. And note the further provision that: "No State shall, without the Consent of Congress, lay any Duty of Tonnage," as to which see also note 17 above.

It was thus expressly contemplated, in some instances, that the combined exercise of the powers of Congress and the states should be free from restrictions expressly applicable to each when exerted in isolation.   It is true that some of these provisions have been held applicable only to foreign commerce, e. g., the prohibition of Article I, § 10, against levy of duties on imports or exports without Congress' consent.   *Woodruff* v. *Parham,* 8 Wall. 123; *American Steel & Wire Co.* v. *Speed,* 192 U. S. 500, 519, *et seq.;* but see *Brown* v. *Maryland,* 12 Wheat. 419.   But others apply to coastwise trade, indeed to trade between towns in the same state, in other words to intrastate commerce.   *State Tonnage Tax Cases,* 12 Wall. 204, 219; and see *Pennsylvania* v. *Wheeling & Belmont Bridge Co., supra; Louisiana Public Service Comm'n* v. *Texas & N. O. R. Co.,* 284 U. S. 125; cf. *Williams*

the exercise of all the power of government residing in our scheme.[48] Clear and gross must be the evil which would nullify such an exertion, one which could arise only by exceeding beyond cavil some explicit and compelling limitation imposed by a constitutional provision or provisions designed and intended to outlaw the action taken entirely from our constitutional framework.

In this light the argument that the degree of discrimination which South Carolina's tax has involved, if any, puts it beyond the power of government to continue must fall of its own weight. No conceivable violation of the commerce clause, in letter or spirit, is presented. Nor is contravention of any other limitation.

---

v. *United States*, 255 U. S. 336; and see also *United States* v. *The William*, 28 Fed. Cas. No. 16,700.

All these provisions are intimately and expressly related to the commerce power. Notwithstanding their diversities, in application to interstate and foreign commerce or both, and also to federal and state power or their combined operation, no conclusion can be drawn from them that our constitutional policy was, or is, to give Congress and the states acting together broad powers, in some instances denied to each acting alone, in relation to foreign commerce, but to deny such authority altogether in reference to interstate commerce. Indeed the opposite conclusion is clearly indicated, both by virtue of express provision where applicable and by strong inference where not expressly forbidden.

[48] The ruling is not new or only recent. "We have already said, and the principle is undoubted, that the act of the legislature of Virginia conferred full authority to erect and maintain the bridge, subject to the exercise of the power of congress to regulate the navigation of the river. That body having in the exercise of this power, regulated the navigation consistent with its preservation and continuation, the authority to maintain it would seem to be complete. That authority combines the concurrent powers of both governments, state and federal, which, if not sufficient, certainly none can be found in our system of government." *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 430. Compare this with Mr. Justice McLean's dissenting view, note 34 above.

A word should be added in the latter respect.  Prudential has not urged grounds founded upon other constitutional provisions than the commerce clause, except in relation to the McCarran Act and then only in the event it should be construed as having effect to validate continued exaction of the tax.  As has been said, it regards the statute as neither intended nor effective to "validate, authorize, or sanction state statutes which discriminate against interstate commerce."  But, against the event that the Act should be taken as intended to have such an effect, it puts forward the somewhat novel contentions that the statute would be in violation of the due process clause of the Fifth Amendment; of the first clause of Article I, § 8, requiring that "all Duties, Imposts and Excises shall be uniform throughout the United States"; of Article I, § 1, "which requires legislation to be enacted by Congress"; and, apparently, of the Tenth Amendment, "as a violation of the states' power to tax for purposes of raising revenue *for their own use,* which power is vested exclusively in the states." [49]

These arguments may be summarily disposed of.  As for the due process contention, it was settled by a long line of authorities prior to the *South-Eastern* decision, that the similar provision of the Fourteenth Amendment,

---

[49] The contentions are stated in appellant's brief as follows: "If it be assumed that the McCarran-Ferguson Act is an adoption by Congress of legislation of the states, then the Act is unconstitutional (1) as a violation of the due process clause of Fifth Amendment to the Constitution, (2) as a violation of Article I, Section 8, Clause 1 of the Constitution which requires that excises shall be uniform throughout the United States in the exercise by Congress of its taxing power, (3) as a violation of Article I, Section 1 of the Constitution which requires legislation to be enacted by Congress, and (4) as a violation of the states' power to tax for purposes of raising revenue *for their own use,* which power is vested exclusively in the states."

as well as that requiring equal protection of the laws, does not forbid the states to lay and collect such a tax as South Carolina's.[50] Certainly the Fifth Amendment does not more narrowly confine the power of Congress; nor do it and the Fourteenth taken together accomplish such a restriction upon the coordinated exercise of power by the Congress and the states.

The argument grounded upon the first clause of Article I, § 8, requiring that excises shall be uniform throughout the United States, identifies the state exaction with the laying of an excise by Congress, to which alone the limitation applies. This is done on the theory that no more has occurred than that Congress has "adopted" the tax as its own, a conception which obviously ignores the state's exertion of its own power and, furthermore, seeks to restrict the coordinated exercise of federal and state authority by a limitation applicable only to the federal taxing power when it is exerted without reference to any state action.[51] The same observation applies also to the contention based on Article I, § 1.

The final contention that to sustain the Act, and thus the tax, would be an invasion of the state's own power of

---

[50] ". . . It has never been held that a State may not exact from a foreign corporation as a condition to admission to do business the payment of a tax measured by the business done within its borders." *Lincoln National Life Ins. Co.* v. *Read*, 325 U. S. 673, 677. See *Ducat* v. *Chicago*, 10 Wall. 410; *Philadelphia Fire Assn.* v. *New York*, 119 U. S. 110; *Hanover Fire Ins. Co.* v. *Harding*, 272 U. S. 494; *Continental Assurance Co.* v. *Tennessee*, 311 U. S. 5. See discussion in Henderson, The Position of Foreign Corporations in American Constitutional Law (1918) 101 ff.

[51] The related contention that Congress' "adoption" of South Carolina's statute amounts to an unconstitutional delegation of Congress' legislative power to the states obviously confuses Congress' power to legislate with its power to consent to state legislation. They are not identical, though exercised in the same formal manner. See *Clark Distilling Co.* v. *Western Maryland R. Co.*, 242 U. S. 311, 327.

taxation is so clearly lacking in merit as to call for no comment other than to point out that, by juxtaposition with the contentions discussed in the preceding paragraph, the effect would be at one stroke to bring the Act into collision with limitations operative only upon the federal power and at the same time to nullify state authority.

No such anomalous consequence follows from the division of legislative power into the respective spheres of federal and state authority. There are limitations applicable to each of these separately and some to their coordinated exercise. But neither the former nor the latter are to be found merely in the fact that the authority is thus divided. Such a conception would reduce the joint exercise of power by Congress and the states to achieve common ends in the regulation of our society below the effective range of either power separately exerted, without basis in specific constitutional limitation or otherwise than in the division itself.[52] We know of no grounding, in either constitutional experience or spirit, for such a restriction. For great reasons of policy and history not now necessary to restate, these great powers were separated. They were not forbidden to cooperate or by doing so to achieve legislative consequences, particularly in the great fields of regulating commerce and taxation, which, to some extent at least, neither could accomplish in isolated exertion.[53]

We have considered appellant's other contentions, including the suggestion that the McCarran Act, construed as we have interpreted it and thus given effect, would involve an unconstitutional delegation by Congress of its

---

[52] "It would be a shocking thing, if state and federal governments acting together were prevented from achieving the end desired by both, simply because of the division of power between them." Ribble, 211. And see note 48.

[53] Cf. note 47.

power to the states. For reasons already set forth and others, including the fact that no instance of delegation is involved on the facts, we find them without merit.

The judgment accordingly is

*Affirmed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.