**In re WORKERS' COMPENSATION INSURANCE ANTITRUST LITIGATION.**

**Civ. No. 3–83–497.**

United States District Court,
D. Minnesota,
Third Division.

Nov. 2, 1983.

Vance K. Opperman, Opperman & Paquin, K. Craig Wildfang, Minneapolis, Minn., for plaintiffs.

Thomas E. Harms, Hessian, McKasy & Soderberg, Minneapolis, Minn., Leon R. Goodrich, St. Paul, Minn., William F. Conlon, Joan Perry Protess, Chicago, Ill., Lee L. Bennett, Iris J. Brown, Hartford, Conn., John F. Bonner, Jr., Richard G. Braman, Minneapolis, Minn., Wil Mahler, Rochester, Minn., James Loken, Francis Barron, Minneapolis, Minn., William M. Hannay, William Montgomery, Chicago, Ill., Peter Hendrixon, Michael Bress, Minneapolis, Minn., for defendants.

## MEMORANDUM ORDER

MAGNUSON, District Judge.

This matter is before this court on defendants' motion to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). A hearing was held before the Honorable Paul A. Magnuson on Friday, September 23, 1983. Vance Opperman, Esq., Richard Braman, Esq., Wil Mahler, Esq., Andrew MacIntosh, Esq., John Bonner, Jr., Esq., and K. Craig Wildfang, Esq., appeared on behalf of plaintiffs. James Loken, Esq., and Francis Barron, Esq., appeared on behalf of defendant Home Insurance Company; William F. Conlon, Esq., appeared on behalf of defendant Aetna Casualty & Surety. William Hannay, Esq., and William Montgomery, Esq., appeared on behalf of defendant Twin City Fire Insurance. Peter Hendrixon, Esq., appeared on behalf of defendant Travelers Insurance. Leon Goodrich, Esq., appeared on behalf of defendant St. Paul Fire & Marine Insurance Company. Thomas E. Harms, Esq., appeared on behalf of the remaining defendants.

On May 3, 1983, this court consolidated three similar antitrust actions for pretrial purposes. Each of these actions include substantially the same allegations. Plaintiffs are employers with businesses in the State of Minnesota who are required, under Minnesota law, to carry workers' compensation insurance or to qualify as "self-insured". The defendants are insurance companies, providing workers' compensation insurance to Minnesota employers, and the Workers' Compensation Insurers' Rating Association of Minnesota ("WCIRA"). The WCIRA is organized pursuant to *Minn.Stat.* § 79.11 (1982) and all of the defendants are required to be members. The essence of the plaintiffs' complaint is that the defendants have engaged in unauthorized price fixing in violation of the antitrust laws. On June 6, 1983, defendants filed a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed.R.Civ.P. 12(b)(6). Discovery and class certification proceedings were stayed on June 9, 1983 pending the outcome of the present motion. The basis of the defendants' motion is that the McCarran Act exempts the conduct alleged in the plaintiffs' Complaint from the federal antitrust laws.

In *Bennett v. Berg*, 685 F.2d 1053 (8th Cir.1982) the Eighth Circuit Court of Appeals outlined the test to be applied to Rule 12(b)(6) motions:

> A complaint must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. "Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual

case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." [citations omitted].

*Id.* at 1057–58. Thus, for purposes of the present motion, the court will assume that the defendants engaged in price fixing.

## BACKGROUND

In *Paul v. Virginia*, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1869) the United States Supreme Court held that insurance contracts were not transactions in interstate commerce and could not be regulated by Congress. As a result of the *Paul* decision, the regulation of insurance companies was left to the states. In the 75 years following *Paul*, nearly every state adopted an extensive body of regulations governing the insurance industry. The validity of these regulations was never threatened until 1944 when the Supreme Court handed down its decision in *United States v. South-Eastern Underwriters Ass'n.*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).

In *South-Eastern* the United States indicted the South-Eastern Underwriters Association and several insurance companies for conspiracy to restrain trade by fixing prices. The defendants argued that they could not be indicted under the antitrust laws since they were not engaged in inter-

state commerce. The district court agreed. The United States Supreme Court reversed holding that insurance was part of interstate commerce. *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 553, 64 S.Ct. 1162, 1173, 88 L.Ed. 1440 (1944). The *South-Eastern* decision had several far reaching implications. First, the Supreme Court's holding, that insurance contracts were a part of interstate commerce, threatened the validity of the regulatory schemes painfully established by the states for more than three-quarters of a century. More importantly, from the standpoint of the insurance industry, the decision left the insurance industry open to widespread antitrust liability. For years the states had permitted, and in some cases required, insurance companies to engage in conduct which violated the Sherman Act.

Though the "state action" doctrine, enunciated in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), protected insurance companies from state-mandated violations of the antitrust laws, that doctrine was extremely narrow and did not cover many of the activities previously engaged in by insurance companies.

■ In response to the *South-Eastern* decision, Congress enacted the McCarran Act.[1] Congress was persuaded that the

---

**1.** For a more poetic version of the history of the McCarran Act, *see* Mertz, *The First Twenty Years—A Case-Law Commentary on Insurance Regulation Under the Commerce Clause,* 1964 A.B.A. Section of Ins., Negligence & Compensation L. 153 (quoting remarks of H. McCallion at a symposium on insurance and antitrust law, New York, 1963) where the author states:

In an "old testament" not related to mosaic law we may read of a compatible couple called Paul and Virginia, who are somewhat incompatibly referred to in prosaic law as Paul against Virginia. And it is there written that Paul and Virginia lived in a wonderful Garden in which it was the law of the land that insurance *was not* commerce. There they dwelled for 75 years, calmly contemplating each other's virtues, unmindful of the rude competitive world beyond their Garden. Then in a "new testament" we may learn of a new association, rather unromantically called "South-Eastern Underwriters" which intruded upon the Garden of Paul and Virginia and

drove them hence into the outer world where it was the law of the land that insurance *was* commerce and when it crossed state lines was interstate commerce.

At once, the insurance children of Paul and Virginia became heir to the limitations and ills of the Flesh that had long plagued others who had not been so fortunate as to dwell in the Garden. We may read in detail what these limitations are in the Books of Sherman, Clayton, and Federal Trade Commission. . . .

But there were many in the land of US who thought that the punishment so suddenly vented upon the insurance children of Paul and Virginia was much too severe. It was not merely that each of them had to turn over a new leaf. It was rather that, having lived in their innocence in the Garden for so long a period, they were ill prepared for this newly regulated mode of living and, moreover, they were truly different from the other inhabitants in form and in spirit.

continued regulation of the insurance industry was in the public interest and that the effective underwriting of risks required cooperation among insurance companies. 15 U.S.C. § 1011.[2] 15 U.S.C. § 1012(a) is the substantive provision providing for the continued regulation and taxation of the business of insurance by the states.[3] 15 U.S.C. § 1013(a) provided for the limited suspension of the anti-trust laws until 1948. Those sections of the McCarran Act dealing with the anti-trust immunity of insurance companies are codified in 15 U.S.C. §§ 1012(b) and 1013(b).

15 U.S.C. § 1012(b) states:

No act of Congress shall be construed to *invalidate, impair, or supersede* any law enacted by any state for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, *unless such Act specifically relates to the business of insurance:* Provided, that after June 30, 1948 [the Sherman Act, Clayton Act, and the FTC Act] shall be applicable to the *business of insurance* to the extent that such business is *not regulated* by State law. *Id.* (emphasis supplied).[4] Congress went on to provide in § 1013(b) that nothing in the McCarran Act should be construed to render the Sherman Act inapplicable to an agreement to boycott, coerce or intimidate. Thus, it is well settled that in order for an insurance company to qualify for the McCarran Act exemption it must show that the activities are the *"business of insurance"*; are *"regulated by state law"*; and do not constitute a *"boycott".*

As a prelude to determining whether the conduct in question constitutes the "business of insurance" it is necessary to understand Minnesota's statutory scheme for establishing workers' compensation rates. Prior to 1979, workers' compensation premiums were set by an administrative process involving a ratemaking bureau and the Commissioner of Insurance. Insurance companies were required by law to provide workers compensation coverage to Minnesota employers. The ratemaking bureau, which consisted of insurance companies

In order to ascertain what was done to loosen the bonds to which they became subject, we must turn now to the words found in the Act of McCarran. . . .

2. As one commentator has observed, there are several overriding goals behind the regulation of the insurance industry; insurer solvency and reasonable rates. Enforcement of the antitrust laws would further the goal of fair, reasonable and efficient rates. However, to some extent, competition would hinder the goal of maintaining insurer solvency. The McCarran Act allows states to further the goal of insurer solvency by setting the rates for insurance premiums. The McCarran Act also represents a policy decision that the states should be free to regulate but that if the states refuse to regulate, the insurance industry should be competitive. Carlson, *The Insurance Exemption From the Antitrust Laws,* 57 Tex.L.Rev. 1127, 1139 (1979).

3. The McCarran Act was upheld in *Prudential Ins. Co. v. Benjamin,* 328 U.S. 408, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). In *Prudential* the Supreme Court upheld, against a commerce clause attack, a state statute that taxed foreign insurers at 3% of the premiums from business within the state but imposed no tax on domestic insurers. It seems quite likely that the statute at issue in *Prudential* would have been unconstitutional absent the McCarran Act. As a result of *Prudential,* Congress can delegate its commerce clause powers to the states and permit the states to exercise that power in a manner that, absent the delegation, would be a violation of the commerce clause. The Supreme Court correctly interpreted the congressional policy behind the McCarran Act by stating that Congress "clearly put the full weight of its power behind existing and future legislation to sustain it from any attack under the commerce clause. . . . *Id.* at 431, 66 S.Ct. at 1155. For an excellent history of the McCarran Act *see* M.C. Weller, *The McCarran-Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy,* 1978 Duke L.J. 587.

4. It is clear that 15 U.S.C. § 1012(b) contains two distinct clauses. The plaintiffs argue that the first clause applies and that this court should apply the antitrust laws because they do not "invalidate, impair, or supersede" a state law. The defendants argue that only the proviso of § 1012(b) applies to the present case. The two sections of § 1012(b) apply in different situations. The first sentence is intended to make state law supreme in any conflict with federal law unless Congress clearly expresses its intent to cover the insurance industry with a particular statute. The proviso deals specifically with the application of the antitrust laws.

providing workers' compensation coverage, compiled actuarial and statistical information on various underwriting risks. The bureau established a price for each risk which was subject to approval by the Commissioner. Once the Commissioner established a price the insurance companies were required to provide insurance at that price. The plaintiffs agree that if the conduct in question had occurred prior to 1979 the defendants would not be subject to any antitrust liability.[5]

In 1979, Minnesota amended its workers' compensation statute. The amendments included a similar ratemaking procedure whereby the rating bureau recommended rates to the Commissioner. The one significant change was that the rates set by the Commissioner were *maximum* rates and the insurance companies were expressly permitted to charge lower rates.[6] *Minn. Stat.* § 79.21 (1982). It is clear that the purpose behind the amendment to *Minn. Stat.* § 79.21 was to permit competition in setting workers' compensation premiums, subject only to the ceiling established by the Commissioner.

The plaintiffs allege that after 1979 the insurance companies entered into a private agreement to fix the price of workers' compensation premiums at the maximum price established by the Commissioner of Insurance. In so doing, plaintiffs allege that the defendants not only defeated the intent of Minn.Stat. § 79.21 but violated the antitrust laws in the process. The plaintiffs do not challenge the ratemaking process established by the State of Minnesota. Rather, they claim that after the ratemaking process was over and the maximum price was set by the Commissioner the defend-

ants entered into a private, unregulated, side agreement to maintain premiums at the maximum rate permitted by law.

## BUSINESS OF INSURANCE

Plaintiffs and defendants agree that the Supreme Court's recent decisions in *Union Labor Life Insurance Company v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982) and *Group Health & Life Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979) established the test for whether certain activity constitutes the "business of insurance." The *Pireno* Court enunciated three criteria for determining whether conduct constitutes the "business of insurance" within the meaning of the McCarran Act.

> *First*, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and insured; and *third*, whether the practice is limited to entities within the insurance industry.

*Id.* 102 S.Ct. at 3009 (*citing Royal Drug*). *Royal Drug* involved an agreement between Blue Shield and various pharmacies in which Blue Shield agreed to fully reimburse pharmacies participating in the agreement and to only partially reimburse non-participating pharmacies. In *Pireno*, the Union Labor Life Insurance Company used a "peer review" system for evaluating whether chiropractors' charges were "reasonable" or "necessary medical care services". In both *Pireno* and *Royal Drug* the Court analyzed the challenged conduct under the criteria set out above and concluded that it did not constitute the "business of insurance".

---

5. The plaintiffs do not concede that if the present conduct had occurred prior to 1979 it would have been protected by the McCarran Act. Rather, they argue that the "state action" doctrine would have foreclosed antitrust liability.

6. Minnesota's decision to permit competition in the setting of premiums is part of a national trend favoring deregulation. *See* L. Sullivan and J. Wiley, *Recent Antitrust Developments: Defining the Scope of Exemptions, Expanding*

*Coverage, and Refining the Rule of Reason.* 27 UCLA L.Rev. 265, 272 (1979). As of 1979, sixteen states, led by California, adopted legislation giving individual companies freedom to set their own prices. *Id.* Moreover, a recent Justice Department study concluded that restricted price competition would be an effective alternative to state regulation of property and liability insurance. Dennis, *The Justice Department Study—An Update*, 13 Forum 920, 922–23 (1978).

The problem with both *Pireno* and *Royal Drug* is that the Court formulated the three step analysis for purposes of determining whether ancillary activities carried on by insurance companies constituted the "business of insurance". Neither Court squarely addressed the issue of whether blatant price fixing constitutes the "business of insurance". Minnesota's statutory scheme for fixing the maximum price for workers' compensation premiums is certainly part of the "business of insurance". The United States Supreme Court recognized this in *SEC v. National Securities*, 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969) when it said "[c]ertainly the fixing of rates is part of this business; that is what *South-Eastern Underwriters* was all about". *Id.* The defendants contend that the entire ratemaking process including, for purposes of this motion, the private price fixing agreement is part of the "business of insurance". The plaintiffs concede that Minnesota's statutory scheme for establishing the maximum price is part of the "business of insurance" but argue that the defendants' private price fixing conspiracy is not a part of the "business of

insurance". The issue before this court is whether price fixing becomes something other than the "business of insurance" because it is done illegally.

The plaintiffs' view of the McCarran Act is somewhat akin to an inverse pre-emption analysis. They argue that when the Minnesota Legislature amended *Minn.Stat.* § 79.21 to provide for competition it removed price fixing from the definition of the "business of insurance". If Minnesota were suddenly to move back into the field and set the price for workers' compensation premiums the state law would "preempt" the Sherman Act; price fixing would be protected by the McCarran Act and would once again be part of the "business of insurance". What the plaintiffs are really saying is that price fixing is not the "business of insurance" because it is not regulated by the states. If it was regulated by the states (i.e., pre-1979) it would be part of the "business of insurance".

There are several flaws in the plaintiffs' argument. The plaintiffs' argument collapses the first two of the three steps in a McCarran Act exemption analysis.[7] In-

---

**7.** There is some support for the proposition that the first two elements of the McCarran Act test should be unified. The first argument is based upon the language of the McCarran Act itself which states that the antitrust laws shall be applicable to the business of insurance "to the extent that such business is not regulated by State law". 15 U.S.C. § 1012. The second argument is based on a reading of congressional intent. As one commentator put it:

A more satisfactory approach would be to develop a "business of insurance" test explicitly aimed at limiting McCarran's scope to insurance company activities that can rationally be claimed to need anticompetitive regulation, such as the cooperative data gathering or risk posing arrangements mentioned earlier. Specific state regulatory efforts would then guide the Federal Courts in identifying exempt "business of insurance" activities. This approach would be consistent with McCarran's purpose of allowing states the authority to control the insurance business in the ways they think best.

Some may object that such an approach confuses the three heretofore distinct McCarran tests. The proposed test would indeed establish common ground between the "business of insurance" and the "regulated by state law" elements of the Act's tests. It would also

bring both of these elements into congruance with the proposed mode of interpreting the "boycott, coercion, or intimidation" exception.... Perhaps the Court is en route to such an interpretation of the "business of insurance" test, but until it again speaks on the topic, these observations must remain speculative.

L. Sullivan & J. Wiley, *Recent Antitrust Developments; Defining the Scope of Exceptions, Expanding Coverage, and Refining the Rule of Reason*, 27 UCLA L.Rev. 265, 285 (1979). By collapsing the "business of insurance" and "state regulation" elements, the test becomes essentially whether the legislature intended to permit certain conduct. If it did, the antitrust laws would not apply. If the legislature did not intend to permit certain anticompetitive conduct the antitrust laws would be the enforcement mechanism to carry out the legislature's will. At a time when more and more states are deregulating the insurance industry in the hopes that increased competition will result in lower prices to policyholders it may well be that such an interpretation of the McCarran Act would best carry out public policy. However, it is clear from *Royal Drug, Pireno* and *St. Paul* that a proper McCarran Act exemption analysis requires three analytically distinct steps.

stead of first asking whether a discreet activity constitutes the business of insurance and then asking if that activity is regulated by state law, the plaintiffs urge upon this court a circular argument: the activity is the business of insurance *only if* it is regulated by state law. Though this argument has some appeal the recent Supreme Court cases which have considered the McCarran Act exemption have all concluded that the statute requires a court to determine whether the activity is the business of insurance before determining whether that activity is regulated by state law or is a boycott.

■ The position that each of these inquiries is distinct is supported by the Supreme Court's recent decision in *Group Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In *Royal Drug* the Supreme Court rejected a functional policy-based analysis of whether conduct constituted the "business of insurance" in favor of a more technical approach. The Court cited such standard works as Couch, Keeton, and Webster's Dictionary in defining the term "insurance". *Id.* at 211, 99 S.Ct. at 1073. It is clear from the Supreme Court's analysis in *Royal Drug* that the determination of whether a particular activity constitutes the "business of insurance" is not dependent upon whether that activity is regulated by state law. The plaintiffs agree that the ratemaking procedure, established pursuant to the Minnesota statutory scheme, is part of the "business of insurance." Ever since the McCarran Act was passed states have enacted regulations governing ratemaking. The plaintiffs' argument can be reduced to the simple proposition that ratemaking is not part of the "business of insurance" if it is illegal. The Supreme Court has squarely rejected this proposition. *Id.* at 210 n. 5, 99 S.Ct. at 1072 n.5 ("It is axiomatic that conduct which is not

exempt from the antitrust laws may nevertheless be perfectly legal.") Ratemaking is inherently part of the "business of insurance" and it is no less so simply because it may be illegal.[8]

## STATE REGULATION

■ Having determined that the activity in question is part of the "business of insurance", the court must next decide whether ratemaking is "regulated by the state" within the meaning of the McCarran Act. The state regulation requirement has given rise to two schools of thought. Plaintiffs support the view that in determining whether a state regulates the business of insurance the court must first look to see if the state has adopted statutes or regulations governing the *particular conduct at issue.* The defendants support the view that a general scheme of regulation is sufficient to satisfy the state regulation requirement.

The leading Supreme Court case on the state regulation requirement of the McCarran Act is *Federal Trade Commission v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). In *National Casualty* the Federal Trade Commission, pursuant to 15 U.S.C. § 45, ordered several insurance companies to stop deceptive advertising. The insurance companies argued on appeal that the McCarran Act prohibited the FTC from regulating the advertising of insurance companies since that conduct was already regulated by states that had adopted the "Model Unfair Trade Practices Bill for Insurance". *Id.* at 564, 78 S.Ct. at 1262. The Supreme Court agreed holding that the state regulation was sufficient to invoke the McCarran Act. *Id.* at 565, 78 S.Ct. at 1262.

The Supreme Court also expressly rejected the FTC's argument that the state regu-

---

8. As the Supreme Court stated in *Royal Drug:* One question not resolved by [the] legislative history is which of the various practices alleged in the *South-Eastern Underwriters* indictment Congress intended to be covered by the phrase "business of insurance." The in-

dictment in that case had charged, for example, that the defendants had fixed their agents' commissions as well as premium rates. It is clear from the legislative history that the fixing of rates is the "business of insurance."

lation was not effective enough to invoke the McCarran Act saying:

> [The FTC] urges that a general prohibition designed to guarantee certain standards of conduct is too "inchoate" to be "regulation" until that prohibition has been crystallized into "administrative elaboration of these standards and application in individual cases." However, assuming there is some difference in the McCarran-Ferguson Act between "legislation" and "regulation", nothing in the language of that Act or its legislative history supports the distinction drawn by the petitioner.

*Id.* The Court in *National Casualty* indicated that it was unnecessary to inquire into the effectiveness of a particular regulation.

Plaintiffs also argue that since "the challenged conduct is *not* the 'business of insurance', the conclusion inevitably follows that it is not the business of insurance regulated by state law". *Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss at page 16.* In light of this court's conclusion that the present activity is part of the "business of insurance", plaintiffs' position is untenable.

The plaintiffs' final argument that the challenged conduct is not regulated by state law is that the 1979 amendments to the workers' compensation statute, permitting competition, expressly withdrew state regulation. This is the plaintiffs' version of the argument that says in determining whether activity is regulated by state law a court must look specifically at the challenged conduct. They claim that the specific activity in question is no longer regulated by the state and the antitrust laws should therefore apply. If this reasoning is extended the exemption would not apply unless the state regulation prohibited all activity which, absent the McCarran Act, would violate the antitrust laws. This argument was addressed and squarely rejected in *Dexter v. Equitable Life Assurance Society of U.S.*, 527 F.2d 233 (2d Cir.1975). *Dexter* involved a tying arrangement between life insurance and mortgage loans.

In addressing the state regulation argument, the court stated:

> Plaintiffs' second argument, as we understand it, is that because tying arrangements of this sort were not specifically prohibited by Connecticut law at the time of the challenged transactions, those transactions were not "regulated by State law" and the antitrust laws apply under the proviso of section 1012(b), quoted in note 2 supra. But this argument misunderstands the nature of the state regulation contemplated by the statute. State power to regulate necessarily includes the discretion to prohibit, permit, or limit insurance practices as the state sees fit. The McCarran-Ferguson Act clearly contemplates that where a state undertakes to regulate the business of insurance, it has the power to permit practices which would otherwise violate federal antitrust laws; if the exemption is only to apply when state law squarely prohibits all acts which would, absent the exemption, violate the antitrust laws, the state regulation which the McCarran-Ferguson Act aims to foster, 15 U.S.C. §§ 1011, 1012(a), would be a nullity.

*Id.* at 236. The *Dexter* Court went on to hold that Connecticut law regulated tying arrangements because the Commissioner of Insurance was given authority to order the discontinuance of unfair, illegal or improper practices. *Id.*

In *Ohio AFL–CIO v. Insurance Rating Board*, 451 F.2d 1178 (6th Cir.1971) the Sixth Circuit had occasion to consider the scope of regulation needed to invoke the McCarran Act. In *Ohio AFL–CIO* the UAW brought suit against the Insurance Rating Board alleging price fixing in violation of the Sherman Act. The Sixth Circuit noted the conflict over the extent of regulation necessary to invoke the McCarran Act and then concluded that:

> The controlling test is ... whether the state has "generally authorized or permitted certain standards of conduct".

*Id.* at 1182. The Eighth Circuit Court of Appeals adopted the approach taken by the Sixth Circuit in *Ohio AFL–CIO*. *Lawyers*

*Title Co. v. St. Paul Title Insurance Corp.,* 526 F.2d 795 (8th Cir.1975). In *Lawyers Title* the Eighth Circuit stated:

The Sixth Circuit has held "[I]f a state has generally authorized or permitted certain standards of conduct, it is regulating the business of insurance under the McCarran Act." *Ohio AFL–CIO v. Insurance Rating Board,* 451 F.2d 1178, 1181 (6th Cir.1971), *cert. denied,* 409 U.S. 917 [93 S.Ct. 215, 34 L.Ed.2d 180] (1972). We agree, and hold that if the state statute generally regulates the pricing schedules and conduct of the insurance companies, this suffices to exempt the insurance carriers so regulated from federal antitrust suits.

*Id.* at 797. This court need only determine whether Minnesota has a general scheme for regulating insurance. Minnesota has done more than provide a general scheme of regulation; it has a comprehensive statute and a body of regulations which govern almost every aspect of the workers' compensation scheme. *Minn.Stat.* § 72A.17 (1982) states that:

The purpose of sections 72A.17 to 72A.32 is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress), by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined.

*Id.* § 72A.17 indicates that the Minnesota Legislature intended to occupy the field by defining and prohibiting any activity it considered unfair or deceptive. In addition, Chapter 79 gives the Commissioner of Insurance broad powers over the activities of individual insurance companies and the rating association. Thus, for purposes of the McCarran Act, the State of Minnesota regulates the business of insurance.

## BOYCOTT

■ Even if the activity in question is found to be the "business of insurance" and is regulated by state law, the Sherman Act will still apply to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation". 15 U.S.C. § 1013(b). Until recently it was generally thought that the "boycott" exception to the antitrust exemption did not apply to disputes between an insurer and the insured.[9] However, in *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978) the United States Supreme Court squarely held that an agreement among insurance companies not to deal with policyholders, in order to coerce submission to another company's coverage terms, constituted a boycott.

In *St. Paul* a group of Rhode Island doctors sued the only four insurance companies offering medical malpractice insurance, in the state, on the ground that three of them had refused to sell malpractice insurance in order to force compliance with St. Paul's restrictive malpractice coverage.[10] The problem remaining after *St. Paul* is to define the scope of the term "boycott" for *McCarran Act purposes.*[11]

---

**9.** *See Addrisi v. Equitable Life Assurance Society of the United States,* 503 F.2d 725 (2d Cir.1974) *cert. denied.* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975) (Dismissing policyholder complaint that tied life insurance to home loans on the ground that plaintiff was not a member of the class of persons to be protected by "boycott" provision of the McCarran Act. *See also,* Hamric, *The McCarran-Ferguson Act: A Time for Procompetitive Reform,* 29 Vanderbilt L.Rev. 1271 (1976) where the author states that "Policyholders rarely if ever succeed in suits under 3(b)." *Id.* at 1279.

**10.** The *St. Paul* court did not consider whether the challenged conduct constituted the "business of insurance" or was "regulated by state law." Both of these issues were conceded.

**11.** At oral argument in the present case both parties spent a significant amount of time arguing over the meaning of the term "boycott". Part of the confusion stems from the question of whether "boycott" has the same meaning in antitrust law as it does for purposes of the McCarran Act. Though the issue has never been squarely decided, Justice Powell didn't think so in *St. Paul* when he stated the issue as "whether the conduct in question involves a

The defendants argue strenuously that any interpretation of "boycott" requiring anything less than an absolute refusal to deal, on any terms, would expand the boycott exception to the point of swallowing the McCarran Act exemption, since any agreement to fix prices can be seen as an agreement to *refuse to deal except on an agreed upon price.*[12] The defendants go on to argue that since the plaintiffs were required by law to purchase workers' compensation insurance from the defendants there was no "absolute refusal to deal." The defendants' argument is that as long as the Minnesota statute forces them to deal with the plaintiffs, as a matter of law there can be no boycott within the meaning of the McCarran Act.

The plaintiffs argue that there is no difference between a concerted refusal to deal *except upon specified terms* and an *absolute* refusal to deal. Ordinary price fixing can be viewed as a refusal to deal except at a specified price. Under this view the term "absolute refusal to deal" means that one party refuses to engage in economic relations with another for the purpose of forcing the other party to agree to certain terms and conditions. In the *St. Paul* case itself three insurance companies refused to deal with the customers of St. Paul Fire & Marine Insurance Company in order to force those customers into accepting medical practice insurance *on the terms specified by St. Paul. St. Paul Fire & Marine Insurance Company v. Barry,* 438 U.S. 531, 533, 535, 98 S.Ct. 2923, 2925, 2926, 57 L.Ed.2d 932 (1978). The court in *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.,* 179 F.Supp. 65 (N.D.Cal.1959), in considering the distinction between an absolute refusal to deal and a refusal to deal except upon specified terms stated expressly that "[t]he distinction is without substance." *Id.* at 66. Moreover, Justice

Stewart alluded to the same problem in *St. Paul* when he said:

> Most practices condemned by the Sherman Act can be cast as an act or agreement of "boycott, coercion, or intimidation." For example, price fixing can be seen either as a refusal to deal except at a uniform price (i.e. a boycott), or as an agreement to force buyers to accept an offer on the sellers' common terms (i.e. coercion).

*St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 559 n.6, 98 S.Ct. 2923, 2939 n. 6, 57 L.Ed.2d 932 (Stewart, J., dissenting). Thus there is substantial support for the plaintiffs' proposition that there is no logical distinction between price fixing and an absolute refusal to deal.

Though plaintiffs' argument is persuasive, a closer reading of the *St. Paul* decision convinces this court that for purposes of the McCarran Act there is a difference between an absolute refusal to deal and price fixing and the latter does not constitute a boycott under the McCarran Act. The only dissenting opinion in *St. Paul* was authored by Justice Stewart. The basis for the dissent was the fear that the majority had expanded the definition of "boycott" under the McCarran Act, to the point where it swallowed the Antitrust exemption. As Justice Stewart stated:

> The broad reading the Court gives to § 3(b) seems to me not only to misconceive the larger design of the Act but also to distort its basic purpose. Section 3(b) is an absolute exemption to § 2(b). It brings back under the Sherman Act a range of practices, whether authorized by state law or not. By construing § 3(b) very expansively, the Court narrows the field of regulation open to the States. Yet it was clearly Congress' intent to give the States generous license to govern the business of insurance free of interference from the antitrust

---

boycott, not whether it is per se unreasonable". *St. Paul,* 438 U.S. at 542, 98 S.Ct. at 2930.

**12.** One definition of the term "boycott" noted with approval in *St. Paul,* was a

method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the Target.
438 U.S. 531, 533, 541, 98 S.Ct. 2923, 2925, 2929, 57 L.Ed.2d 932 (1978).

laws....  ... if "boycott is to be given the same scope it has in Sherman Act case law, then so should "coercion" and "intimidation". But that reading of § 3(b) would plainly devour the broad antitrust immunity bestowed by § 2(b). Congress could not logically have intended that result.

*Id.* at 558–559, 98 S.Ct. at 2938–39. It is clear that the dissenters in *St. Paul* feared that the majority's interpretation of boycott would encompass nearly every activity prohibited by the Sherman Act. *St. Paul,* 438 U.S. 531, 559 n. 6, 98 S.Ct. 2923, 2939 n. 6, 57 L.Ed.2d 932.

The majority opinion expressly dealt with Justice Stewart's concern stating:

> We note our disagreement with Mr. Justice STEWART's expression of alarm that a reading of the operative terms of § 3(b), consistent with traditional Sherman Act usage, "would plainly devour the broad antitrust immunity bestowed by § 2(b)." [Post at 559, 98 S.Ct. at 2938]. Whatever the precise reach of the terms "boycott," "coercion," and "intimidation," the decisions of this Court do not support the dissent suggestion that they are coextensive with the prohibitions of the Sherman Act. See *e.g., Eastern States Lumber Assn. v. United States,* 234 U.S. 600, 611, 34 S.Ct. 951, 954, 58 L.Ed. 1490 (1914), quoting *Gompers v. Bucks Stove & Range Co.,* 221 U.S. 418, 438, 31 S.Ct. 492, 496, 55 L.Ed. 797 (1911). In this regard, we are not cited to any decision illustrating the assertion, [post at 559 n. 6, 98 S.Ct. at 2939 n. 6], that price fixing, *in the absence of any additional enforcement activity,* has been treated either as a "boycott" or "coercion."

*Id.* at 545 n. 18, 98 S.Ct. at 2932 n. 18 (emphasis supplied). It is clear that both the majority and dissent in *St. Paul* wished to avoid any interpretation of the McCarran Act which would convert ordinary price fixing into a boycott thereby destroying the McCarran Act exemption.

After *St. Paul* there appears to be an undesignated point, on the line between "mere price fixing" and an absolute refusal to deal, where enforcement activity in support of a conspiracy to fix prices gives rise to a "boycott" for purposes of the McCarran Act exemption.[13] The plaintiffs allege in their complaint that the defendants conspired to *enforce* their price fixing agreement. This is a 12(b)(6) motion and the court must accept the truth of that allegation. Because some level of enforcement activity, in support of a price fixing conspiracy, will give rise to a "boycott" for purposes of the McCarran Act and because the plaintiffs have alleged enforcement activity, this court cannot say that, as a matter of law, the plaintiffs may not recover.

The court wishes to make clear that the denial of defendants' 12(b)(6) motion is based on the lack of any factual data concerning the enforcement activity in support of the price fixing conspiracy. This motion was structured as a motion to dismiss and no affidavits were presented to the court. It may well be that discovery will reveal the extent, if any, of enforcement activity in support of the alleged price fixing conspiracy. Nothing in this order precludes the defendants from bringing a motion for summary judgment pursuant to Rule 56 supported by affidavits at a later stage in these proceedings.

In summary, this court concludes that the price fixing conspiracy alleged in plaintiffs' Complaint is part of the "business of insurance" and various Minnesota statutes "regulate the business of insurance" for purposes of the McCarran Act. However, this court cannot conclude that, as a matter of law, the plaintiffs have failed to state a cause of action under the boycott exception. Accordingly,

IT IS ORDERED that:

1. Defendants' motion to dismiss for failure to state a claim upon which relief can be granted is denied.

---

**13.** Unless the price fixing conspiracy is merely an inchoate criminal offense there is almost always some enforcement activity in support of a price fixing conspiracy.