LEGAL ASSET FUNDING, LLC, et al.,

v.

TRAVELERS CASUALTY & SURETY COMPANY, et al.

No. 99–5254 (NHP).

United States District Court, D. New Jersey.

May 8, 2001.

Michael R. Perle, New York, NJ, Thomas A. DeClemente, DeClemente & Associates, Glen Rock, NJ, for Plaintiffs Legal Asset Funding, LLC and Wayne G. Kirkpatrick.

Thomas G. Rohback, Elizabeth J. Gorman, LeBoeuf Lamb Greene & MaCrae, Newark, NJ, for Defendants Aetna Life Insurance and Annuity Company, Travelers Property & Casualty Corp., Travelers Life and Annuity Company and Travelers Casualty and Surety Company.

POLITAN, District Judge.

Dear Counsel:

This matter comes before the Court on the motion of defendants Travelers Casualty & Surety Company, Travelers Property & Casualty Corp., Travelers Life and Annuity Company, and Aetna Life Insurance and Annuity Company to dismiss, or in the alternative for summary judgment, and the plaintiffs Wayne G. Kirkpatrick and Legal Asset Funding, LLC's motion for summary judgment. This Court heard oral argument on October 23, 2000. For the following reasons, the plaintiffs' motion

for summary judgment is **DENIED** and the defendants' motion for summary judgment is **GRANTED**.

## BACKGROUND

Plaintiff, Wayne G. Kirkpatrick ("Kirkpatrick"), was injured in a motorcycle accident on February 21, 1987, in the State of New York.[1] As a result of his accident, he entered into a structured settlement with Connecticut insurer Aetna Casualty & Surety Company ("Aetna Casualty") on November 13, 1991. Pursuant to that structured settlement agreement (hereinafter the "Structured Settlement"), Kirkpatrick was to receive from Aetna Casualty at least the sum of $131,297.36, to be paid out in monthly installments over a 300 month period, coupled with a further guaranty by Aetna Casualty to pay him at least $1,000 per month until October 1, 2017. Thereafter, if he was still living, Aetna Casualty would continue making payments in such amount for the remainder of his lifetime. The structured portion of the settlement was funded through an annuity issued by Travelers Life and Annuity Company, a Connecticut corporation.[2] The annuity contract did not contain an anti-assignment provision.

On October 1, 1998, the Connecticut legislature enacted Conn. Gen.Stat. § 52–225f, which regulates the transfer of structured settlement payment rights.[3] Section 52–225f provides that no transfer of structured settlement payment rights are effective unless several requirements are satisfied. First, § 52–225f(b) requires that the transferee provide a written disclosure statement to the payee containing material information such as the discounted present value of all structured settlement payments to be transferred. The transfer must also be approved by a court pursuant to the following subsection:

(c)(1) Prior to any transfer, the payee entitled to receive payments under such structured settlement shall commence a declaratory judgment action under section 52–29 for a determination as to whether the transfer of such structured settlement payment rights is in the best interests of the payee and is fair and reasonable to all interested parties under all of the circumstances then existing. The annuity issuer and the structured settlement obligor shall be made parties to such action. If the court determines, after hearing, that such transfer should be allowed, it shall approve such transfer upon such terms and conditions as it deems appropriate.

(2) The court in which the original action was or could have been filed or the

---

1.  At the time of the accident, Kirkpatrick resided in New York. He has since moved to Texas.

2.  Aetna Casualty was subsequently acquired by Travelers Property & Casualty Corp. and renamed "Travelers Casualty & Surety Company." As a result, the owner of the annuity is Travelers Casualty. For purposes of convenience, the Court will refer to defendants collectively as "Travelers."

3.  It appears the move is afoot across the nation to pass similar legislation requiring court approval of structured settlement sales. As of June 2000, thirteen states have enacted such legislation. *See* Michael Booth, *Measure* *to Limit Factoring of Structured Settlement Advances,* 160 New Jersey Law Journal 1219, 1234 (June 19, 2000). New Jersey has a comparable bill, S–944 and A–2146, respectively, currently alive in both the Senate and Assembly. *See id.* at 1219. Delaware, Ohio and Tennessee have similar bills pending in their respective legislatures. *See id.* at 1234. In addition, lobbyists for both structured settlement purchasers and insurers recently agreed on a model statute which allows for the sale of structured settlement annuities with court approval. *See* Henry Gottlieb, *Structured Settlements for Sale,* 161 New Jersey Law Journal 1197, (Sept. 18, 2000).

court which has jurisdiction where the applicant resides shall have jurisdiction over any such action.

Confronted with financial adversity, Kirkpatrick agreed to transfer a portion of the Structured Settlement proceeds to Settlement Funding Inc. ("Settlement Funding") on August 11, 1999, in exchange for a lump sum payment of $20,100.00.[4] Settlement Funding is a Georgia entity having a close business relationship with plaintiff Legal Asset Funding, LLC ("Legal Asset"). By an assignment agreement dated September 10, 1999, Settlement Funding assigned its interest in Kirkpatrick's Structured Settlement to Legal Asset. Travelers refuses to honor the transfer and pay Legal Asset pursuant to the transfer agreement unless plaintiffs comply with § 52–225f.

Legal Asset filed its initial Complaint in the nature of a declaratory judgment action on November 10, 1999. It filed an Amended Complaint on June 20, 2000. Pursuant to this Court's directive, Legal Asset filed a Second Amended Complaint on July 13, 2000, in order to join Wayne Kirkpatrick as a plaintiff. Legal Asset complains that Travelers refuses to recognize the transfer agreement between Kirkpatrick and Legal Asset because neither Legal Asset nor Kirkpatrick has complied with § 52–225f.

In seeking declaratory relief pursuant to 28 U.S.C. § 2201, Legal Asset's principle contentions are that Conn. Gen.Stat. § 52–225f violates the Commerce Clause, the Due Process Clause and the Contracts Clause of the United States Constitution. *See* Second Amended Complaint, Counts I,

II & III. This is so, Legal Asset asserts, because § 52–225f unlawfully regulates out-of-state transactions concerning the transfer of structured settlement rights between nonresident parties and applies retroactively to Kirkpatrick's Structured Settlement agreement. *See id.* Further, Legal Asset alleges that the statute also violates the Connecticut Constitution's Due Process Clause and Conn. Gen.Stat. § 55–3. *See id.* at Counts IV and V.

The defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) and (6), or in the alternative for summary judgment, and plaintiffs' motion for summary judgment are currently before the Court.[5]

## *DISCUSSION*

### I. *Summary Judgment Standard*

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, for which that party will bear the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See id.* at 323, 106 S.Ct.

---

4. The assignment agreement executed between Kirkpatrick and Settlement Funding contains a condition precedent, which requires Settlement Funding to obtain a final nonappealable court order conveying the assigned payment to Settlement Funding.

5. Defendants' also moved to dismiss under Fed.R.Civ.P. 12(b)(7) for failure to join Kirkpatrick, but this argument is mooted by Kirkpatrick's subsequent joinder.

2548. Whether a fact is material is determined by the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.*, 860 F.2d 1209, 1219 n. 3 (3d Cir.1988), *cert. denied*, 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989). Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility . . . . against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir.1983) (citing *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972)).

Further, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. An issue is "material" only if the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To defeat "a properly supported summary judgment motion, the party opposing it must present sufficient evidence for a reasonable jury to find in its favor." *Groman v. Tp. of Manalapan*, 47 F.3d 628, 633 (3d Cir.1995). Accordingly, the party opposing summary judgment may not merely restate the allegations of its pleadings. *See Farmer v. Carlson*, 685 F.Supp. 1335, 1339 (M.D.Pa.1988). Moreover, a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record, *see Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548, nor can one rely upon speculation and conclusory allegations, *see Groman*, 47 F.3d at 637. If the record, as a whole, cannot "lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## II. *Ripeness of Plaintiffs' Constitutional Claims*

■ Travelers first insists that plaintiffs' claims are not ripe for adjudication before this Court because Legal Asset, as Settlement Funding's assignee, has yet to satisfy the condition precedent contained in the assignment agreement. That condition precedent requires Settlement Funding to obtain a final nonappealable court order conveying the assigned payment to Settlement Funding prior to paying Kirkpatrick. Travelers argues that until Legal Asset (as Settlement Funding's assignee) fulfills this condition precedent the Court cannot address the constitutional issues as presented.

■ Federal courts are constitutionally constrained to decide only actual cases or controversies. *See* U.S. CONST. art. III. The rationale behind the ripeness doctrine is to avoid premature adjudication by preventing courts from entangling themselves in abstract disagreements involving contingent future events which may not occur as anticipated, or indeed which may not occur at all. *See Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998); *Thomas v. Union Carbide Agricultural Prod. Co.*, 473 U.S. 568, 580–81, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other*

*grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). To evaluate ripeness, a court must look at the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott,* 387 U.S. at 149, 87 S.Ct. 1507.

■ "Ripeness is a matter of degree whose threshold is notoriously hard to pinpoint." *NE Hub Partners, L.P. v. CNG Transmission Corp.,* 239 F.3d 333, 341 (3d Cir.2001). As it has been said, "[t]he more that the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa." *Artway v. Attorney General of N.J.,* 81 F.3d 1235, 1249 (3d Cir.1996).

Here, Travelers' ripeness argument is without merit. That a condition precedent exists in the assignment agreement is of no moment since Travelers is forcing plaintiffs to comply with the very statute they argue is unconstitutional. Travelers suggests that it would honor the assignment to Legal Asset so long as a court order is obtained pursuant to the statute. Legal Asset contends that the statute is unconstitutional and therefore they need not comply with its requirements. Indeed, only legal issues are before the Court. As such, this disagreement clearly constitutes a "case or controversy" which this Court must resolve.

### III. *The Interstate Commerce Clause Claim*

■ In its Second Amended Complaint, Legal Asset contends that § 52–225f violates the so-called "dormant" commerce clause because it unlawfully regulates interstate commerce in violation of Article I, § 8 of the United States Constitution. In this instance, for example, Legal Asset argues that § 52–225f has an improper regulatory effect on a contract between parties from separate states who reside outside of Connecticut.

The McCarran–Ferguson Act, 15 U.S.C. § 1011 *et seq.* (the "Act"), was passed in 1945 with the primary objective of granting the states broad regulatory authority over the business of insurance. *See Securities & Exchange Comm'n v. National Sec., Inc.,* 393 U.S. 453, 459, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) ("The McCarran Ferguson Act was an attempt ... to assure that the activities of insurance companies in dealing with their policyholders would remain subject to state regulation"). The Act was passed in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which applied federal antitrust laws to insurance companies engaged in interstate commerce. Prior to the Court's decision in *South–Eastern Underwriters,* it was widely understood that transactions involving the business of insurance were not subject to federal regulation as interstate commerce. *See United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 499, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). In *South–Eastern Underwriters* wake, insurers and states alike were flustered as to who held the power to tax and regulate the insurance industry. *See id.* Concerned that the business of insurance was now considered interstate commerce, insurers and states feared that ordinary supremacy rules would restrict a state's ability to regulate insurance companies as they had in the past. *See id.* at 499–500, 113 S.Ct. 2202. As a result, Congress swiftly enacted the McCarran Ferguson Act in order to restore state supremacy in the insurance regulation arena.

Section 1011 of the McCarran–Ferguson Act provides as follows:

Congress hereby declares that the continued regulation and taxation by the

several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

15 U.S.C. § 1011.

The Act's next section provides, in pertinent part:

(a) State regulation

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) Federal regulation

No Act of Congress shall be construed to invalidate, impair, or supercede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance....

15 U.S.C. § 1012.

▬ This statutory scheme creates a reverse-preemption doctrine for insurance legislation. *See Fabe*, 508 U.S. at 507, 113 S.Ct. 2202; *Suter v. Munich Reinsurance Co.*, 223 F.3d 150, 160 (3d Cir.2000). That is, a state statute that regulates insurance presumptively preempts a contrary Congressional statute unless the Congressional statute specifically relates to insurance.

In light of the McCarran–Ferguson Act's unequivocal purpose, the Supreme Court has repeatedly held that by passing the Act Congress "removed all Commerce Clause limitations on the authority of the States to" regulate the business of insurance. *Western and Southern Life Ins. Co. v. State Bd. of Equalization of California*, 451 U.S. 648, 653, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981). *See also Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 219 n. 18, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); *State Bd. of Ins. v.*

*Todd Shipyards Corp.*, 370 U.S. 451, 452, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962); *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 319, 75 S.Ct. 368, 99 L.Ed. 337 (1955). Indeed, in *Western & Southern Life*, the Court did not mince words in finding that because "Congress ordain[ed] that the States may freely regulate an aspect of interstate commerce, any action taken by a State within the scope of the congressional authorization is rendered invulnerable to Commerce Clause challenge." 451 U.S. at 652–53, 101 S.Ct. 2070. *See also Prudential Ins. Co. v. Hobbs*, 328 U.S. 822, 66 S.Ct. 1360, 90 L.Ed. 1602 (1946) (*per curiam* ) (upholding Kansas retaliatory insurance tax); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 431, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946) (upholding South Carolina discriminatory insurance premiums tax, stating that the Act "put the full weight of [Congress'] power behind existing and future state legislation to sustain it from any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for.").

Taking into consideration the plain language of the Act and the Supreme Court's interpretation thereof, it is difficult to surmise how a statute such as § 52–225f does not fall under the protective tentacles of the McCarran Ferguson Act. There can be no doubt that the statute at issue here regulates the business of insurance. By its terms § 52–225f applies where the payee is domiciled in Connecticut or where the payee is "entitled to receive payments under a structured settlement funded by an insurance contract issued by an insurer domiciled in this state or owned by an insurer or corporation domiciled in this state...." Conn. Gen.Stat. § 52–225f(b).

▬ A structured settlement arises when a tort defendant or its liability carri-

er purchases an annuity from a life insurance company, with the tort plaintiff as the beneficiary, to settle a civil lawsuit. The annuity is funded by the insurance carrier. The annuity is owned by the insurance company and the tort plaintiff is the annuitant. It is a tripartite endeavor involving the defendant or its liability carrier, the annuity company, and the plaintiff-annuitant. Instead of receiving a lump sum payment from an insurance carrier (or, in many cases, in addition to a lump sum payment), an annuitant receives a stream of periodic payments into the future. As such, a structured settlement annuity truly originates from the underwriting of a risk by an insurance company and the insurance company's decision to pay out a claim made against a particular policy.[6]

Although in some instances an annuity in and of itself is properly classified as an investment instrument, *see NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 261, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995), an annuity arising out of a structured settlement is funded by insurance policy proceeds.[7] This is distinguished from a traditional investment annuity, which is typically funded by an individual's personal funds. As such, it is inextricably tied to the tort defendant's insurance policy, and, as a result, to the business of insurance.

As an insurance product, structured settlements funded by insurance policy proceeds are therefore eminently subject to regulation by the States and escape Commerce Clause scrutiny. Until and unless Congress decrees otherwise, then, Legal Asset cannot prevail on its Commerce Clause challenge.

## IV.  *The Contracts Clause Claim*

■  Legal Asset next claims that § 52–225f violates the Contracts Clause of the Constitution. Legal Asset argues that because § 52–225f was enacted after Kirkpatrick entered into the Structured Settlement, but before he attempted to assign his rights, the statute applies retroactively to frustrate his right to assign which was implied in the Structured Settlement agreement.[8]

■  Article I, § 10, of the Constitution provides, in pertinent part: "No State shall ... pass any ... Law impairing the Obligation of Contracts." Establishing a violation of the Contracts Clause is well-settled. First, the Court must ask whether the change in state law has "operated as a substantial impairment of a contractual relationship." *General Motors v. Romein*, 503 U.S. 181, 186, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234,

---

**6.**  An important feature in defining something as "insurance" is whether the activity involves the underwriting of risk. *See SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 72–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (the "VALIC" case). The *VALIC* Court stated that "true underwriting of risks [is] the one earmark of insurance." *Id.* at 73, 79 S.Ct. 618.

**7.**  The Connecticut statute in question here defines the "interested parties" as including the beneficiary, the annuity issuer and the structured settlement obligor. *See* Conn. Gen.Stat. § 52–225f(a)(3). The statute defines an "annuity issuer" as an insurer that

has issued any insurance contract used to fund periodic payments under a structured settlement. *See* Conn. Gen.Stat. § 52–225f(a)(1).

**8.**  When read in conjunction with Conn. Gen. Stat. § 55–3, which provides that Connecticut's general statutes have only prospective effect, it is clear that § 52–225f is only intended to apply to future transfer agreements entered into after the effective date of the statute, October 1, 1998. So clearly the statute properly applies to Kirkpatrick's assignment agreement which occurred after the effective date of the statute.

244, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978)). "Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation." *Id.* at 245, 98 S.Ct. 2716.

In determining the degree to which an obligation has been impaired, one must be mindful that the Contracts Clause is designed to "enable individuals to order their personal and business affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Id.* The obligations protected by the clause "include [ ] not only the express terms [of the contract] but also the contemporaneous state law pertaining to interpretation and enforcement." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19–20 n. 17, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977).

Plaintiffs here have not established a Contracts Clause violation.[9] The principle obligations and rights of the parties to the Structured Settlement agreement in this case are not impaired, much less substantially impaired, by § 52–225f. Kirkpatrick's right to receive a steady stream of periodic payments is not hindered. The annuity company's obligation to make the periodic payments to Kirkpatrick is not forgiven by the statute. And the liability carrier's obligation to fund the annuity is not excused by the statute. Thus, in this respect there is no impairment to the Structured Settlement agreement whatsoever.

Neither does the statute impose a substantial impairment on Kirkpatrick's right to assign the Structured Settlement payments. It does not operate to prevent or extinguish Kirkpatrick's right of assignment. Although the right of assignment is arguably implied in any contract, it must be emphasized that in this case the statute in question does not eliminate that right. It merely requires the obtaining of a court order before assignment occurs, which might constitute an impediment but cannot possibly rise to the level of a *substantial* impairment. Pursuant to § 52–225f, a transfer of structured settlement payment rights will receive judicial imprimatur if it is in the payee's best interests and fair and reasonable to all interested parties. In fact, the statute even attempts to alleviate any burden of complying with the law by allowing for the court order to be obtained in a court of the annuitant's home state.

Moreover, the alleged impairment in this case is much different than that which occurred in *Whirlpool Corp. v. Ritter*, 929 F.2d 1318 (8th Cir.1991). In that case, the statute at issue completely eliminated the plaintiff's prior contractual right. Here, on the other hand, Kirkpatrick's right to assign is not eliminated. As such, the statute's requirement is not overly burdensome. Indeed, Kirkpatrick and Settlement Funding voluntarily placed in their assignment agreement a clause which requires prior court approval as a condition precedent to an assignment of the Structured Settlement proceeds. Accordingly, the Act cannot be said to impair Kirkpatrick's right to assignment when his own assignment agreement imposed similar, if not virtually identical, burdens on the assignment right.

To the extent that the right to assign is subject to the potential vagaries of judicial review, *i.e.*, the potential that a

9. It should be noted that a Connecticut state court recently rejected a Contracts Clause challenge to § 52–225f. *See Rumbin v. Utica Mutual Ins. Co.*, 1999 WL 130333, *2 (Conn.Super. March 2, 1999), *aff'd*, 254 Conn. 259, 757 A.2d 526 (2000).

judge might conclude that transfer of structured settlement payment rights is not in a payee's best interests, this Court will defer to the legislative judgment of Connecticut concerning the importance of the public purpose of the statute and the manner in which that purpose is being pursued. *See Transport Workers Union of America, Local 290 v. Southeastern Pennsylvania Transp. Auth.*, 145 F.3d 619, 621 (3d Cir.1998). *See also Keystone Bituminous Coal Ass'n v. Duncan*, 771 F.2d 707, 717 (3d Cir.1985) ("Unless the state itself is a contracting party the courts should defer to the legislative judgment as to the reasonableness of the particular measure...."); *Nieves v. Hess Oil Virgin Islands Corp.*, 819 F.2d 1237, 1249 (3d Cir.1987) ("Courts are required to defer to the legislature's judgment concerning the necessity and reasonableness of economic and social legislation.").

The legislative history of the statute indicates it was passed for several reasons. Connecticut's legislature was concerned about the threat of uncertain tax implications visited upon the insurer and the plaintiff as a result of transferring rights to a settlement purchaser, protection of plaintiffs who transfer their structured settlement payment rights at too deep a discount, and the possibility that insurers in certain circumstances would have to make payments to both the claimant and the

structured settlement purchaser. *See* Conn. Joint Standing Committee Hearings, Judiciary Committee, 1998 Sess., pp. 726, 729, 782–83, 906–07. The statute properly addresses these concerns and this Court must defer to the Connecticut legislature's judgment in this regard.[10]

## V.  The Due Process Claim

▮ Lastly, plaintiffs' Due Process Clause claim is without merit as well. The Due Process Clause of the Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1. It is true that a contract right is a "form of property." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 19 n. 16, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Yet, it must be stressed again that the fundamental terms of the Structured Settlement agreement in this case are not impaired by § 52–225f. The statute here only touches upon the right to assign, and it does not extinguish that right. Hence, there is no due process violation.

▮ Moreover, the Court utilizes a less stringent standard when assessing Due Process Clause claims than when it appraises Contract Clause claims. In *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, the Court contrasted the "limita-

---

**10.** In fact, it would seem that structured settlement purchasers would no doubt deplore § 52–225f as originally drafted in the Connecticut legislature even more than the ultimate bill as enacted. The bill as originally drafted required the payee to receive consent from the annuity company before a transfer could occur-consent that was in all likelihood not forthcoming. *See* Conn. Joint Standing Committee Hearings, Judiciary Committee, 1998 Sess., pp. 726, 788. The ultimate version as passed by the legislature, of course, was significantly altered. In testimony before the Judiciary Committee, a representative of the National Association of Settlement Pur-

chasers ("NASP") strenuously objected to a bill which required approval of the annuity company. *See id.* at 788–89. Interestingly, the NASP representative expressed concern that the original version contained no consumer protection measures such as relief from a court. *See id.* at 788. The NASP representative also suggested that submission of the issue to a court was one possible approach. *See id.* at 792. In light of the bill's drastic transformation, it appears the Connecticut legislature adopted several of the NASP's recommendations in passing § 52–225f.

tions imposed on States by the Contract Clause with the *less searching* standards imposed on economic legislation by the Due Process Clauses." 467 U.S. 717, 733, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (emphasis added). The Due Process Clause generally does not prohibit retrospective civil legislation, unless the consequences are particularly "harsh and oppressive." *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1938). *See also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 14–20, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Stated another way, it need only be justified by a rational legislative purpose. *See Pension Benefit Guaranty*, 467 U.S. at 730, 104 S.Ct. 2709.

Here, it cannot be said that § 52–225f is "harsh" or "oppressive." Indeed, even if the statute has retroactive application, it is justified by a rational legislative purpose. As stated above, the legislative history of the statute indicates it was passed for several valid reasons. These are completely rational and legitimate legislative purposes which this Court cannot question. It is clear the statute was thoughtfully considered by the Connecticut legislature, which elicited testimony and responses from many groups both supporting and opposing the legislation. That one group disagrees with a particular bill and the reasons behind its enactment does not make the bill defective.

Furthermore, in this case there exists a clear Connecticut nexus since Kirkpatrick agreed to a Structured Settlement agreement with a Connecticut insurer and Legal Asset seeks to step into Kirkpatrick's shoes. Thus, upon transfer of the payment rights, Legal Asset would be receiving payments from Travelers Casualty, a Connecticut corporation. In fact, the assignment agreement between Kirkpatrick and Settlement Funding—which terms control the assignment to Legal Asset— includes an express statement of the "Con-

necticut Disclosure" and the identification of the Connecticut insurer, Travelers. Moreover, the statute itself contemplates a Connecticut nexus in every case since it only applies to a payee domiciled in Connecticut or a payee receiving payments under a structured settlement funded by a Connecticut insurer. Accordingly, plaintiffs' Due Process Clause claim is also dismissed.

## VI. *State Law Claims*

All that remain are the claims founded on Connecticut state law. In its Second Amended Complaint, plaintiffs alternatively invoke diversity jurisdiction pursuant to 28 U.S.C. § 1332 over the state law claims. However, as Travelers correctly points out, plaintiffs admit the amount in controversy does not exceed the required $75,000.00. The Second Amended Complaint states that under the transfer agreement Kirkpatrick is to receive a lump sum payment of $20,100.00. *See* Seconded Amended Complaint, ¶ 11. In return, Settlement Funding or its assigns (here, Legal Asset) is to receive $600 per month for 60 months, which amounts to $36,000.00. *See id.* As such, plaintiffs have not satisfied the amount in controversy requirement.

Neither will the Court retain supplemental jurisdiction over the state law claims. This Court possesses supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). However, 28 U.S.C. § 1367(c)(3) permits a district court at its discretion to decline to exercise supplemental jurisdiction where the court has dismissed all claims over which it has original jurisdiction. *See Lyon v. Whisman*, 45 F.3d 758, 760 (3d Cir.1995). The state law claims are therefore dismissed without prejudice.

### CONCLUSION

For the foregoing reasons, the plaintiffs' motion for summary judgment is **DENIED**

and the defendants' motion for summary judgment is **GRANTED**. Accordingly, Counts I (Commerce Clause), II (Due Process) and III (Contracts Clause) of the plaintiffs' Second Amended Complaint are **DISMISSED WITH PREJUDICE**, and Count IV (Connecticut Due Process) and Count V (Connecticut Statute) of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE**.