**UNITED PARCEL SERVICE, INC., Petitioner,**

v.

**INDIANA DEPARTMENT OF STATE REVENUE, Respondent.**

No. 49T10–0704–TA–24.

Tax Court of Indiana.

Sept. 16, 2013.

Richard D. Birns, J. Edward Goff, Birns & Goff, Philadelphia, PA, Jeffrey S. Dible, Gene F. Price, Frost Brown Todd LLC, Indianapolis, IN, Louisville, KY, Attorneys for Petitioner.

Gregory F. Zoeller, Attorney General of Indiana, Andrew W. Swain, Chief Counsel, Tax Section, Jessica E. Reagan, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

## ORDER ON PETITIONER'S MOTION FOR SUMMARY JUDGMENT

FISHER, Senior Judge.

United Parcel Service, Inc. (UPS) challenges the Indiana Department of State Revenue's denial of its refund claim for the 2000 tax year and its assessment of additional corporate income tax for the 2001 tax year ("the years at issue"). The mat-

ter, currently before the Court on UPS's motion for summary judgment, presents two issues which the Court restates as: 1) whether foreign reinsurance companies must be physically present in Indiana to satisfy the statutory requirement of "doing business" under Indiana Code § 27–1–18–2; and 2) if so, whether Indiana Code § 6–3–2–2.8(4), in providing an exemption from Indiana's corporate income tax to foreign reinsurance companies that are "doing business" in Indiana under Indiana Code § 27–1–18–2, violates the Commerce Clause of the United States Constitution. Finding that physical presence is required and that the Commerce Clause challenge is improper, the Court grants summary judgment to the Department.

## FACTS AND PROCEDURAL HISTORY

UPS and its affiliates ("the affiliated group"), which include the foreign reinsurance companies of UPINSCO, Inc. and UPS Re Ltd., form the world's largest package delivery company. Prior to 2001, UPS included the income of UPINSCO and UPS Re on the affiliated group's Indiana corporate income tax returns. Because UPS filed the returns under the worldwide unitary combined method, it reported the affiliated group's income, deductions, and credits on a combined basis. In 2001, however, UPS excluded the income of UPINSCO and UPS Re from the affiliated group's Indiana return. UPS also subsequently amended its 2000 Indiana return in order to exclude the income of UPINSCO and UPS Re from the return, thereby seeking a refund of $359,466 in income tax initially paid.

After auditing the affiliated group's returns for the years at issue, the Department determined that UPS erred in excluding the income of UPINSCO and UPS Re from the returns. As a result, the Department denied UPS's refund claim and assessed it with an additional income tax liability of $291,105 for 2001. UPS protested the Department's denial of its refund claim and its issuance of the proposed assessment with no success.

In March 2010, after appealing to this Court, UPS moved for summary judgment, asserting that because UPINSCO and UPS Re were "subject to" Indiana's gross premium privilege tax (premiums tax) under Indiana Code § 27–1–18–2, their income was exempt from Indiana's corporate income tax pursuant to Indiana Code § 6–3–2–2.8(4). The Department filed a cross-motion for summary judgment, contending that because UPS failed to comply with several provisions of the premiums tax statutory scheme, UPINSCO and UPS Re were neither "subject to" the premiums tax nor exempt from Indiana's corporate income tax.

On December 29, 2010, in an unpublished decision, this Court granted UPS's motion for summary judgment on the basis that UPINSCO and UPS Re were exempt from Indiana corporate income tax because they were both "subject to" the premiums tax based on the plain and ordinary meaning of the phrase "subject to." *See United Parcel Serv., Inc. v. Indiana Dep't of State Revenue,* No. 49T10–0704–TA–24, slip op. at 6–7, 2010 WL 5549039 (Ind. Tax Ct. Dec. 29, 2010), *rev'd on other grounds,* 969 N.E.2d 596 (Ind.2012) (*UPS I* ). On June 21, 2012, the Indiana Supreme Court reversed this Court's grant of summary judgment to UPS in *UPS I,* explaining:

The plain language of Indiana Code section 27–1–18–2 requires that all insurance companies—like UPINSCO and UPS Re—not "organized under the laws of this state" must, at the very least, show they are "doing business within this state" before the companies are entitled to an exemption from adjusted

gross income [tax]. The very first sentence of the statute reads, "Every insurance company not organized under the laws of this state, ... *and doing business within* this state shall...."

*Indiana Dep't of State Revenue v. United Parcel Serv., Inc.*, 969 N.E.2d 596, 601 (Ind.2012) (*UPS II*) (citation omitted). After determining that the designated evidence failed to show whether UPINSCO and UPS Re were doing business within this state for purposes of Indiana Code § 27–1–18–2, the Indiana Supreme Court remanded the case for further proceedings. *See id.* at 603.

On April 18, 2013, UPS once again moved for summary judgment. The Court held a hearing on August 16, 2013. Additional facts will be supplied as necessary.

## STANDARD OF REVIEW

Summary judgment is proper only when the designated evidence demonstrates that no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[1] Ind. Trial Rule 56(C) (footnote added). Indiana Trial Rule 56(B) provides that "[w]hen any party has moved for summary judgment, the court may grant summary judgment for any other party upon the issues raised by the motion although no motion for summary judgment is filed by such party." T.R. 56(B). When, as here, the material facts are undisputed and a litigant challenges the constitutionality of a statute, the issue presented is purely one of law for which summary judgment is particularly appropriate. *See Dowdell v. City of Jeffersonville*, 907 N.E.2d 559, 564 (Ind.Ct. App.2009) (citation omitted), *trans. denied.*

## ANALYSIS

During the years at issue, Indiana imposed an income tax on the part of every corporation's adjusted gross income that was derived from sources within Indiana. *See* IND.CODE § 6–3–2–1(b) (2000) (amended 2002). Indiana Code § 6–3–2–2.8(4), however, provided certain entities with an exemption from that tax: "there shall be no tax on the adjusted gross income of ... [i]nsurance companies subject to tax under IC 27–1–18–2." IND.CODE § 6–3–2–2.8(4) (2000) (amended 2002). In turn, Indiana Code § 27–1–18–2, in relevant part, provided:

(a) Every insurance company not organized under the laws of this state ... and doing business within this state shall, on or before March 1 of each year, report to the department [of insurance], under the oath of the president and secretary, the gross amount of all premiums received by it on policies of insurance covering risks within this state, or in the case of marine or transportation risks, on policies made, written, or renewed within this state during the twelve (12) month period ending on December 31 of the preceding calendar year. From the amount of gross premiums described in this subsection shall be deducted ... considerations received for reinsurance of risks within this state from companies authorized to transact an insurance business in this state[.]

\*    \*    \*    \*    \*    \*

(c)(1) For the privilege of doing business in this state, every insurance company required to file the report provided in this section shall pay into

---

1. Although the Department did not file a cross-motion for summary judgment, its response states it is entitled to summary judgment and it has designated evidence in support. (*See* Resp't Resp. Pet'r Mot. Summ. J. at 6–13, May 28, 2013; Resp't Des'g Evid., May 28, 2013.)

the treasury of this state an amount equal to [two percent (2%)] of the excess, if any, of the gross premiums over the allowable deductions[.]

IND.CODE § 27–1–18–2(a), (c)(1) (2000) (amended 2001).[2]

### Physical Presence

In its motion for summary judgment, UPS claims that the Indiana Supreme Court's decision in *UPS II* essentially requires foreign reinsurers to be physically present within this state in order to be "doing business" under Indiana Code § 27–1–18–2 and to qualify for the corporate income tax exemption provided under Indiana Code § 6–3–2–2.8(4). (*See* Hr'g Tr. at 4–6, Aug. 16, 2013; Pet'r Mot. Summ. J. ¶ 6, Apr. 18, 2013; Pet'r Br. Supp. Mot. Summ. J. ("Pet'r Br.") at 9, Apr. 18, 2013.) According to UPS, that determination creates tension between Indiana's premiums tax and its corporate income tax because UPS contends the latter utilizes an economic presence standard, not a physical presence standard. (*See* Hr'g Tr. at 6–8 (referring to *MBNA Am. Bank, N.A. & Affiliates v. Indiana Dep't of State Revenue*, 895 N.E.2d 140 (Ind. Tax Ct.2008).) The Department, however, maintains that UPS has misconstrued both *UPS II* and Indiana Code § 27–1–18–2 because neither of those authorities makes any mention of physical presence whatsoever. (*See* Hr'g Tr. at 9–12.)

At the outset, and contrary to UPS's claim, there is no tension between Indiana's premiums tax and its corporate income tax because each utilizes a physical presence standard. Thus, to the extent UPS believes this Court's decision in *MBNA* held that Indiana's corporate income tax utilized an economic presence

standard, it is incorrect. *See MBNA*, 895 N.E.2d at 141–44 (holding that the statutory economic presence basis for imposing Indiana's financial institutions tax ("the FIT") did not violate the substantial nexus requirement of the Commerce Clause of the United States Constitution).

██ Furthermore, while this Court has found that an economic presence rather than a physical presence is a sufficient basis for imposition of the FIT, it cannot reach the same conclusion regarding Indiana's premiums tax for three main reasons. First, the U.S. Supreme Court has explained that a physical presence standard applies for purposes of a premiums tax:

> the limits of [a] state's legislative jurisdiction to tax, [as] prescribed by the Fourteenth Amendment, are to be ascertained by reference to the incidence of the tax upon its objects rather than the ultimate thrust of the economic benefits and burdens of transactions within the state.

*Connecticut Gen. Life Ins. Co. v. Johnson*, 303 U.S. 77, 80, 58 S.Ct. 436, 82 L.Ed. 673 (1938). *See also State Bd. Ins. v. Todd Shipyards Corp.*, 370 U.S. 451, 452–56, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962) (reaffirming *Johnson* nearly twenty years later). Second, this Court's review of Indiana case law and the case law of other jurisdictions reveals decades of uniformity—wherein state courts have routinely declined to impose a premiums tax when foreign insurers/reinsurers lacked a physical presence in the taxing state. *See UPS II*, 969 N.E.2d at 601–03 (remanding the case because the record evidence did not reveal whether UPINSCO's and UPS Re's reinsurance transactions took place in

---

**2.** The 2001 amendment of Indiana Code § 27–1–18–2 has no bearing on the outcome of this matter.

Indiana); *State ex rel. Crittenberger v. Continental Ins. Co. of N.Y.*, 67 Ind.App. 536, 116 N.E. 929, 934–35 (1917) (explaining that a foreign reinsurer did not owe Indiana's premiums tax because it conducted its reinsurance transactions in Illinois, not Indiana).[3]

Finally, neither of the parties has presented a fully developed argument regarding the adoption of an economic presence standard for Indiana's premiums tax. For instance, UPS has encouraged the Court to avoid the issue altogether, arguing that such a finding is unnecessary given its Commerce Clause claim, that the finding would likely conflict with *UPS II* and *Continental Insurance*, and that the finding could have far-reaching, unintended effects in the insurance industry. (*See* Hr'g Tr. at 7–9.) In contrast, the Department has argued that *UPS II* provides that a foreign reinsurer need only show that it has a certificate of authority to satisfy the "doing business" requirement of Indiana Code § 27–1–18–2. (*See* Hr'g Tr. at 13–16; Resp't Resp. Pet'r Mot. Summ. J. at 6–9, May 28, 2013.) Nonetheless, while the Indiana Supreme Court mentioned the necessity of obtaining a certificate of authority in *UPS II*, it did so only in a general discussion of the statutory scheme regarding the business of insurance. *See UPS II*, 969 N.E.2d at 601. That discussion does not indicate that possessing a certificate of authority means a foreign reinsurer is physically present in Indiana; instead, it indicates that a foreign reinsurer must obtain such a certificate to legitimately engage in the reinsurance business in Indiana. *See id.* The plain language of Indiana Code § 27–1–17–8 supports this conclusion as it provides that a certificate of authority "shall *license* [a] foreign or alien insurance[/reinsurance] company to transact only the kind or kinds of insurance specified in its application for admission[.]" IND.CODE § 27–1–17–8 (2013) (emphasis added). Consequently, the Court concludes that foreign reinsurers must be physically present in Indiana to satisfy the statutory requirement of "doing business" under Indiana Code § 27–1–18–2.

### The Commerce Clause

With respect to its Commerce Clause challenge, UPS contends that because the physical presence requirement under Indiana Code § 27–1–18–2 provides a direct competitive advantage to all reinsurance companies conducting business within Indiana over foreign reinsurers like UPINSCO and UPS Re that did not conduct business in Indiana during the years at issue, it violates the Commerce Clause. (*See* Pet'r Br. at 4, 9–10, 14.) More specifically, UPS explains that foreign reinsurers conducting business in Indiana would generally have a lower tax liability than foreign reinsurers conducting business

---

**3.** *See also In re Continental Cas. Co.*, 189 Iowa 933, 179 N.W. 185, 188–89 (1920) (declining to find that foreign insurance companies were doing business within Iowa for purposes of its premiums tax when the reinsurance contracts were executed out-of-state and the premiums and losses were payable out-of-state); *Lincoln Nat'l Life Ins. Co. v. State Tax Comm'n*, 196 Miss. 82, 16 So.2d 369, 369–72 (1944) (holding that an entity's reinsurance premiums were not subject to Mississippi's income tax when the policies were negotiated and executed out-of-state); *People ex rel. Sea Ins. Co. v.* *Graves*, 274 N.Y. 312, 8 N.E.2d 872, 873–75 (1937) (concluding that an entity was not conducting a marine reinsurance business subject to New York's premiums tax when the reinsurance policies were executed out-of-state and the premiums were paid out-of-state); J.B. Glen, Annotation, *What constitutes doing business within state by foreign insurance corporations*, 137 A.L.R. 1128 (1942); 44 C.J.S. Insurance § 125 ("Ordinarily a reinsurance transaction constitutes doing business in the state wherein such contract is consummated").

elsewhere because the latter would be subject to Indiana's corporate income tax. (*See* Pet'r Reply Br. Supp. Mot. Summ. J. at 2, June 21, 2013.)

The Commerce Clause of the United States Constitution grants Congress the power "[to] regulate Commerce ... among the several States[.]" U.S. Const. art. I, § 8, cl. 3. While the Clause is " 'silent as to how much economic regulatory power a state retains, it has been applied to prevent states from discriminating against out-of-state economic interests or from benefiting in-state interests.' " *Rhoade v. Indiana Dep't of State Revenue*, 774 N.E.2d 1044, 1049 (Ind. Tax Ct.2002) (citation omitted). Furthermore, the U.S. Supreme Court has rejected the view that interstate commerce is immune from state taxation. *Id.* (citation omitted).

Prior to 1944, the U.S. Supreme Court consistently held that the business of insurance was not "commerce" for purposes of the Commerce Clause. *See, e.g., Paul v. Virginia*, 75 U.S. 168, 183–84, 8 Wall. 168, 19 L.Ed. 357 (1868), *overruled in part by United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). As a result, insurance transactions were not subject to federal regulation as interstate commerce. *See Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 414–17, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946); *Legal Asset Funding, LLC v. Travelers Cas. & Sur. Co.*, 155 F.Supp.2d 90, 96 (D.N.J.2001).

In 1944, however, the U.S. Supreme Court determined that the business of insurance was commerce within the meaning of the Commerce Clause. *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 552–53, 64 S.Ct. 1162, 88 L.Ed.

1440 (1944). The following year, Congress enacted the McCarran–Ferguson Act, the relevant parts provide:

> Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.

> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance.

15 U.S.C.A. §§ 1011, 1012. The U.S. Supreme Court explained that the obvious purpose of the Act was "to give support to the existing and future state systems for regulating and taxing the business of insurance." *Prudential*, 328 U.S. at 429, 66 S.Ct. 1142. The Supreme Court further explained the Act "put the full weight of [Congress'] power behind existing and future state legislation to sustain it from·any attack under the commerce clause to whatever extent this may be done with the force of that power behind it, subject only to the exceptions expressly provided for." *Id.* at 431, 66 S.Ct. 1142. In other words, Congress, through its enactment of the McCarran–Ferguson Act, once again protected insurance transactions from commerce clause challenges.[4] *See Western &*

---

4. The business of insurance, however, is vulnerable to other constitutional challenges. *See Connecticut Gen. Life Ins. Co. v. Johnson,*

303 U.S. 77, 82, 58 S.Ct. 436, 82 L.Ed. 673 (1938) (holding that a California premiums tax statute designed to tax foreign reinsurers

*Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 652–56, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (footnote added). *See also, e.g., In re Workers'Comp. Ins. Antitrust Litig.*, 574 F.Supp. 525, 527–28 (D.Minn.1983); *City of Charleston v. Gov't Emps. Ins. Co.*, 334 S.C. 67, 512 S.E.2d 504, 506–07 (1999).

Given the plain language, and the U.S. Supreme Court's interpretation, of the McCarran–Ferguson Act it is difficult to surmise how the statutes at issue here do not fall within its scope. Indeed, nearly a century ago, the Indiana Court of Appeals explained that the predecessor to Indiana Code § 27–1–18–2 was a graduated privilege tax, designed to raise revenue and "imposed upon a foreign [insurance or reinsurance] corporation for the privilege of exercising its corporate franchises and carrying on business in a corporate capacity within the state." *Continental Ins.*, 116 N.E. at 933. *See also UPS II*, 969 N.E.2d at 597–98 (stating that the "premiums tax works like an excise tax permitting a foreign reinsurer to do business in the state"

(citation omitted)). Moreover, Indiana Code § 6–3–2–2.8(4) merely exempts foreign reinsurance corporations that conduct business within Indiana from the corporate income tax because they are "subject to" the premiums tax under Indiana Code § 27–1–18–2. *See* I.C. § 6–3–2–2.8(4). These statutes, therefore, plainly concern the regulation and taxation of insurance and are immune from Commerce Clause challenges.[5]

## ORDER

For the above-stated reasons, UPS's motion for summary judgment is DENIED and summary judgment is GRANTED to the Department.

SO ORDERED.

---

that did not conduct reinsurance business in that state violated the Due Process Clause of the U.S. Constitution); *State Bd. of Ins. v. Todd Shipyards Corp.*, 370 U.S. 451, 455–57, 82 S.Ct. 1380, 8 L.Ed.2d 620 (1962) (explaining that Congress never intended to displace the *Johnson* decision, among others, through its enactment of the McCarran–Ferguson Act). *Cf. also, e.g., Western & Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 654–74, 101 S.Ct. 2070, 68 L.Ed.2d 514 (1981) (concluding that California's retaliatory tax, which was only imposed on certain foreign reinsurers, did not violate the Equal Protection Clause of the U.S. Constitution) *with Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 874–83, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985) (concluding that Alabama, in imposing a substantially lower gross premiums tax rate on foreign insurers than domestic insurers, violated the Equal Protection Clause

of the U.S. Constitution). UPS, however, has not raised any such constitutional challenges during the course of these proceedings. (*See* Pet'r Pet., Apr. 20, 2007; Pet'r Br. Supp. Mot. Summ. J. at 17–18, Mar. 12, 2010; Pet'r Resp. Br. Supp. Mot. Summ. J. at 5–6, Apr. 30, 2010; Pet'r Mot. Summ. J. ¶¶ 6–7, Apr. 18, 2013).

5. While some courts have noted that the business of insurance and reinsurance differ, the Indiana Supreme Court has explained that "[r]einsurance is a type of 'insurance for insurers.'" *See Indiana Dep't of State Revenue v. United Parcel Service, Inc.*, 969 N.E.2d 596, 598 (Ind.2012) (*UPS II*). The fact that reinsurance contracts are often considered indemnity contracts rather than insurance contracts is, therefore, irrelevant in this case.